ASTOR HOLDINGS, INC. f/k/a Profile Records, Inc., Plaintiff,

v.

Edward "Trey" ROSKI, III, and Battlebots, Inc., Defendants.

No. 01 Civ.1905(GEL).

United States District Court, S.D. New York.

Aug. 12, 2003.

Fran M. Jacobs, Kurt Hunciker, Duane Morris LLP, New York City, for Plaintiffs Astor Holdings, Inc., and Robot Wars LLC.

James S. Blank, Christopher R. Harris, Latham & Watkins, New York City, for Defendants Edward P. Roski, III, and Battlebots, Inc.

## OPINION AND ORDER

LYNCH, District Judge.

Robot Wars LLC, and Battlebots, Inc., along with their founders, have entertained, in addition to the millions who enjoy the robotic combat events they produce, no less than five federal judges in this District[1] and in California[2] (exclusive of appeals) with six different actions, all concerning the disastrous business relationship that once existed between the creative guru and spiritual leader of the robotic combat community, Marc Thorpe, and the sport's first corporate sponsor, Astor Holdings, Inc., formerly known as Profile Records, Inc. ("Astor"). In the instant campaign, Astor alleges that defendant Edward Roski, III, a robot builder and founder of defendant Battlebots, Inc., (1) tortiously interfered with two contractual agreements Astor had executed with Thorpe, and (2) aided and abetted Thorpe in breaching fiduciary duties he owed Astor as a joint venturer.[3] Astor seeks recovery of revenues it has lost as a result of Thorpe's and Roski's conduct, which allegedly injured its reputation among the robot builders its business depends upon.

Astor, having largely survived defendants' motion to dismiss, and having engaged with Roski in extensive and predictably contentious discovery, must now face its ultimate challenge – the facts – for Roski and Battlebots (hereinafter simply "Roski") have moved for summary judgment. Roski's motion will be granted in part and denied in part.

## BACKGROUND

### I. The Venture Agreement

The following facts are drawn from the voluminous summary judgment record; where material facts are disputed, the dispute is noted and described. In 1992, Marc Thorpe "conceived the idea of competitions involving radio-controlled robots designed to do mayhem to each other." (D.Mem.2.) In order to fund the realization of his concept, Thorpe entered an agreement with Astor on July 22, 1994, forming the "Robot Wars" joint venture. According to that agreement, Thorpe and Astor each acquired a half interest in the Venture; Thorpe contributed his interest in the "Robot Wars" trademark, and Astor promised to contribute $50,000 and "the benefit of its expertise and contacts in the entertainment industry." (DX 1 ¶¶ 1(b), 3(a)-(c).) The agreement bound Thorpe to "devote *the majority* of his professional time to the Venture" and prohibited him from "enter[ing] into an agreement (other than through the Venture) with respect to matters ... within the scope of the Venture," but made no provision for a salary.

**1.** Besides the instant case, *see Profile Records, Inc. v. Thorpe,* Dkt. No. 97 Civ. 5536(DAB); *Robot Wars LLC v. Roski,* Dkt. No. 99 Civ. 2953(JSR); *Robot Wars LLC v. Thorpe,* Dkt. No. 01 Civ. 3195(GEL); and *Astor Holdings, Inc. v. Steefel, Levitt & Weiss, P.C.,* Dkt. No. 03 Civ. 1242(SAS).

**2.** *See Thorpe v. Profile Holdings, Inc., Inc.,* A.P. No. 00–1031 (N.D.Cal.Bankr.)

**3.** The original complaint also asserted causes of action for unjust enrichment and tortious interference with prospective business advantage. The former claim was dismissed in *Astor Holdings, Inc. v. Roski,* 01 Civ. 1905(GEL), 2002 WL 72936, at *17–*18 (S.D.N.Y. Jan. 17, 2002), and the latter was dismissed, essentially voluntarily, in an Order dated May 16, 2002, after some unnecessary wrangling as to the dismissal's preclusive effect on future litigation. Astor subsequently filed an amended complaint containing only the two claims noted above.

(*Id.* ¶ 2(a) (emphasis in original).) The Venture was not to make contracts or expenditures in excess of $500 without the consent of both parties. (*Id.* ¶ 2(a)-(b).) The agreement also contemplated the incorporation of the Venture in New York "as soon as practicable," with Thorpe and Astor having equal shares. (*Id.* ¶ 12.) A corporate shareholders' agreement, to be negotiated "in good faith" by the parties, would then replace the Venture Agreement. (*Id.*)

Astor's $50,000 contribution enabled the Venture to hold the first Robot Wars event in San Francisco in 1994. Events were also held there in 1995 and 1996. Since none of these earned a profit, Astor loaned additional cash to the Venture in those years, including, for a time, a salary it chose to pay to Thorpe. (DX 94 at 11; Plotnicki Aff. ¶ 3.) In early 1996, Astor decided not to make any more advances or loans to the Venture unless it received some consideration (such as a larger stake in the Venture), or unless the Venture obtained some outside investment. (DX 6; Plotnicki Tr. 10–13; Thorpe 7/21/98 Tr., DX 108 at 250.) The 1996 event ultimately went forward with Astor's consent, financed, in part, by a $25,000 loan Thorpe arranged from venture capitalist Robert Leppo, along with funds from Astor and its president, Steven Plotnicki. (Plotnicki Tr. 51–52.) Astor contributed or loaned a total of $368,000 to the Venture through January 1997. (DX 94 at 11.)

As early as late 1995, Astor had proposed, and Thorpe appeared to be close to accepting, an "operating agreement" for a limited liability corporation that would succeed the joint venture. (DX 3; Friedman Tr., DX 122 at 26.) But Thorpe thereafter repeatedly raised objections and no agreement was executed. (*Id.* at 27.) Open disagreement surfaced between Astor and Thorpe when, in January or February of 1997, Astor took the position that no fur-

ther live events would go forward until Thorpe executed an operating agreement. (DX 33 at 2; DX 94 at 10.) By April 1997, Thorpe had nevertheless decided not to sign the proposed agreement "as it stands," and to proceed with planning the 1997 event anyway. (PX 10.) In July 1997, a month before the usual time for the event, he publicized it, made arrangements with agents to sell tickets to it, and contracted for insurance. (PX 11, 14; DX 30–32.) Astor maintains, but Roski disputes, that it did not consent to these arrangements and was ignorant of them until it fortuitously discovered a published advertisement for the event. (PX 15; Pini Tr. 42–44.)

On July 18, 1997, Astor informed Thorpe through its litigation counsel that it believed he had breached the Venture Agreement by making these arrangements (PX 15), and on July 25, filed suit against Thorpe in this District, alleging breach of contract, breach of fiduciary duty, unjust enrichment, trademark infringement, and unfair competition. (PX 19.) It sought damages as well as preliminary and permanent injunctive relief. (*Id.* at 17–19.)

Robot Wars '97 ultimately took place with Astor's blessing, thanks to a settlement reached before Judge Batts on August 6, 1997, that gave Thorpe a license to proceed with the event and required him to sign a new operating agreement whose terms were set forth at the hearing. (PX 21.) But Thorpe never signed the agreement as subsequently proposed by Astor, or another version Astor says it drafted after a court-ordered mediation in December 1997, claiming that the drafts did not accurately reflect the agreements reached in those proceedings. (DX 67, 69, 72.) Correspondence indicates that starting in August 1997, Astor perceived that Thorpe was refusing to negotiate with them at all. (DX 63; PX 29; PX 38 at 2.)

In an apparent effort to pressure Thorpe to execute the promised operating agreement, Astor informed Thorpe on October 14, 1997, that "for financial and strategic reasons" it would not grant him a license to hold Robot Wars in 1998. (DX 56.) In February 1998, Thorpe sought to compel Astor to grant him a license to produce the event, but Judge Batts denied his motion and ordered the parties to mediate again. A mediation held on March 6, 1998, appears to have been fruitless. (PX 29.) Meanwhile, Thorpe appealed Judge Batts's denial of his motion and sought an injunction from the Second Circuit permitting Robot Wars '98 to go forward. That relief was denied on April 29, and Thorpe subsequently withdrew the appeal entirely.

Judicially barred from holding a live event, Thorpe became openly hostile to Astor and even to the Venture itself. On March 20, 1998, he sent a mass e-mail to Robot Wars participants and enthusiasts publicly airing his complaints about Astor and the agreement it was trying to get Thorpe to sign. (PX 30.) He blamed his inability to make arrangements for the 1998 event on Astor, stating that he had "worked far too hard and too long and at far to [sic] much personal sacrifice to be bullied into submission by a wealthy businessman and his clever attorneys" and that "I am not one to succumb to tactics of coercion and intimidation." (*Id.*)

Thorpe wrote to Plotnicki on June 5 proposing that they work out an "interim accommodation to enable the [1998] event to go forward" notwithstanding the persistent inability of Astor and Thorpe to arrive at a "'global' resolution" of their larger problems. (PX 58 at BB03682.) But on June 10, he again publicly berated Astor for withholding its approval for the annual live event (PX 56), and subsequently appeared to have given up on producing a live event or otherwise promoting Robot Wars with Astor.

In early June 1998, the British TV producer Mentorn Films, which had filmed and broadcast earlier Robot Wars events, presented the Venture with the opportunity to introduce Robot Wars to the U.K. on a large scale, promising deals with the BBC and Polygram Video for filming Robot Wars events and licensing of the trademark to computer game manufacturers. (PX 52 at BB10766–67.) Thorpe immediately circulated the correspondence to one of his attorneys with the comment that it needed "urgent attention." (PX 52, 53.) On July 4, apparently taking a page out of Astor's 1997 game plan, Thorpe informed Plotnicki that "There is no approval by the ... Joint Venture for [Robot Wars '98]" (PX 60), and, on July 13, Thorpe's attorney issued a cease-and-desist letter to Mentorn with respect to its use of the Robot Wars trademark, citing Mentorn's contractual arrangements with "Robot Wars Limited" or "Robot Wars UK," entities which the letter stated were "wrongfully creat[ed]." (PX 61.)

## II. *The Bankruptcy and the Bankruptcy Settlement Agreement*

By May 1998, Thorpe, who had received no Robot Wars salary for two years, had accumulated $80,000 in credit card debt along with his debts to Leppo and others. (Thorpe Tr. 193; Thorpe Decl. ¶ 18.) He engaged bankruptcy attorney William Weintraub and, on May 28, filed for bankruptcy in the Central District of California. (DX 98.) In July, Weintraub moved for rejection of the Venture Agreement. (PX 64 at 37–38.) The first reorganization plan submitted by Weintraub, discussed below, was not well received by the bankruptcy court, which urged Weintraub to settle Thorpe's dispute with Astor. (Weintraub Tr. 33.)

Thorpe engaged Frederick Fierst, a licensing attorney, to attempt to negotiate

the settlement. On February 2, 1999, Astor and Thorpe signed a settlement agreement that conveyed full title to the Robot Wars trademark and entity to Astor, in return for a payment of $250,000 and certain royalties to Thorpe. Thorpe was obligated, while he received royalties and at least through September 1, 1999, to "use his reasonable best efforts to ... promote the property [and] help the Robot Wars Entity secure likeness and image rights from the community of robot makers." (DX 75 ¶ 7.) The bankruptcy court approved the settlement on March 5, 1999.

## III. *Roski's Involvement*

Roski had entered the picture at the 1995 event, in which his robot successfully competed. (Roski Aff. 2.) Excited about the event, Roski had approached Gary Pini, an Astor employee, to see how he could "get[ ] involved" financially. He was rebuffed. (Roski 7/16/98 Tr. 28–30.) He nevertheless took it upon himself to seek advertising sponsors for subsequent Robot Wars events, and sent a list of potential sponsors to Pini in February 1996, although nothing came of those leads. (PX 7; Pini Tr. 35.) When Astor sued Thorpe in July 1997, Thorpe's counsel, William M. Scherer, approached Roski's father, Edward Roski, Jr., a wealthy businessman, for assistance with the imminent legal battles. (PX 17.) Astor provides hearsay evidence that Roski's father offered to provide assistance at this time. (PX 18.)

In any case, there is evidence, albeit only in the form of one-way communications from Thorpe and his attorneys, that the Roskis' law firm, Latham & Watkins ("Latham"), had become involved with Thorpe's dispute with Astor by early March 1998, and remained so until early 1999. Prior to the March 6, 1998, mediation session, Thorpe told Roski he thought he needed a transactional attorney. (Thorpe Tr. 104–05.) Roski's father engaged David Rogers of Latham to get "a

better understanding of what this dispute was all about." (Rogers Tr. 27.) Rogers sent another Latham attorney, Andrew Richman, to the mediation for the purpose of reporting back to him. (Richman Tr. 41–42.) Caspar Ewig, Thorpe's litigation attorney, told Astor's counsel that Richman was representing Thorpe.. (PX 26.) According to Rogers, Latham subsequently declined to assist Thorpe, and decided instead to advise Roski, who "was interested in having this Robot Wars event occur in San Francisco." (Rogers Tr. 46.) In early April. 1998, Thorpe thanked Rogers for "taking this on" (PX 37), and thereafter appears to have transmitted to Rogers and/or Roski's father copies of all correspondence regarding Robot Wars. (*E.g.*, PX 32, 34–35, 37–39, 42–43, 52–54.) He provided Rogers with a copy of Thorpe's "Robot Wars" trademark registration (PX 39), a list of Robot Wars' assets (PX 40), and a draft of a letter to Plotnicki (PX 41).

Roski's motivations and intentions are disputed, but it is clear that he wanted to ensure that the live events were held and that he was not averse to helping Thorpe free himself from the relationship with Astor. Thorpe sent Rogers deal documents, dated April 2 and April 8, 1998, outlining proposed arrangements by which, in return for half of Thorpe's interest in Robot Wars, Roski would continue his legal support and fund future Robot Wars events "up to $100 K per event." (DX 70.) These also contemplated possible dissolution of the relationship between Thorpe and Astor. *Id.* On April 29, following the Second Circuit's rejection of Thorpe's request for an injunction, Thorpe's litigation counsel Ewig wrote to Rogers, noting that Thorpe would be meeting with Rogers "this afternoon," and indicating that Rogers should discuss litigation strategy with Thorpe in light of a recent letter from Plotnicki urging a continuation of negotiations. (PX 44.) Ewig also assured Rogers that he did not "want

to interfere with any future course of action you may contemplate." (*Id.*)

It appears that it was Rogers who suggested that Thorpe file for bankruptcy. He believed that the Venture Agreement was "onerous," "obscene," and "unconscionable," and had suggested to Thorpe sometime before April 21, 1998, that bankruptcy could serve the dual goal of "reconfigur[ing]" Thorpe's debt and freeing him of his obligations under the Venture Agreement. (Rogers Tr. 91–92, 185; *see also* PX 45 at BB16641.) A Latham & Watkins bankruptcy attorney, Peter Gilhuly, subsequently discussed bankruptcy issues with Thorpe. (Rogers Tr. 96.) It was Latham that referred Thorpe to bankruptcy attorney Weintraub, and Thorpe paid Weintraub with $150,000 borrowed from Roski, who in turn had borrowed the money from his father. (PX 46, 47.) Thorpe's half interest in the Venture served as security for this loan. (PX 46.)

Roski initially hoped to obtain a stake in the Robot Wars Venture through Thorpe's bankruptcy reorganization. Weintraub's first draft of a reorganization plan, which was never actually filed with the court, contemplated auctioning off the Robot Wars trademark with "stalking horse" protection for any bid by Roski, and Thorpe's employment by a new entity that would acquire his interest in the Venture. (PX 65 at 9, 13, 21–22.) Gilhuly and Weintraub were in frequent, sometimes daily, contact through February 1999; Latham's billing records indicate that Gilhuly discussed the plan with Weintraub (PX 45 at BB16557–79), and specifically the possible sale of the *Robot Wars* trademark (*id.* at BB16558). In an August 15 letter to Gilhuly, Weintraub stated that in drafting the plan, he "tried to be sensitive to the structure that you and Dave Rogers have envisioned for the Plan and for Trey." (PX 65 at

BB10959.) Thorpe testified that he assumed he would "play some role in the business" if Roski acquired the Robot Wars trademark. (Thorpe Tr. 209–10.) When the bankruptcy court rejected the first reorganization plan, Roski, at Weintraub's suggestion, hired Fierst to assist Thorpe in December 1998 as "a critical part of [Roski's] own overall strategy" (according to Weintraub), for the limited purpose of "consult[ing] on those aspects of the proposed global settlement that relate to [Thorpe's] buy-out"; that buy-out was "a smaller part of the larger puzzle representing Mr. Roski's future involvement." (PX 67.) But under circumstances disputed by the parties, Roski ceased to be involved or represented in the bankruptcy negotiations in early 1999 (D. Rule 56.1 Counter–Statement ¶ 94 (citing Fierst Tr. 29–32)), and Roski had no stake in the final settlement between Thorpe and Astor.[4]

On February 3, 1999, a day after execution of the settlement agreement, Gary Cline, a robot maker who may have heard about the settlement terms from Roski (Cline 8/26/99 Tr. 106–09), publicly attacked it in an e-mail broadcast referring to Plotnicki and Astor as "evil" and suggesting that any robot maker who participated in Robot Wars '99 would be a "whore." (PX 74.) On February 22, 1999, Roski held the organizational meeting for Battlebots, Inc., and on March 10, 1999, announced its formation as "a new and unique entry into the expanding field of extreme robotic sports." (PX 75.) Its first event was to take place in Long Beach, California, in August. (*Id.*) The first Battlebots event took place exactly one week before Robot Wars '99 had been scheduled (P. Mem.16), and, according to Astor, Robot Wars '99 had to be cancelled due to lack of interest from robot builders. (Compl.¶ 94.)

---

**4.** Nevertheless, Roski attended and sat next to Thorpe when the bankruptcy court approved the settlement on March 5, 1999. (D.Mem.37.)

#### IV. *Thorpe's Breach of the Bankruptcy Settlement*

Astor claims that sometime before March 11, 1999, it "called upon Thorpe to fulfill his obligations under the settlement agreement," but that Thorpe refused to do so. (Compl.¶ 84.) Furthermore, on March 13, Thorpe posted a message on the Robot Wars Forum that, with obvious sarcasm, purported to praise Robot Wars and to urge robot builders to participate in Robot Wars '99:

> [A]ccording to [Astor], I am not living up to my obligations within the settlement agreement. Specifically, they say that I am not doing enough to get robot builders to participate in Steve's event and to rehabilitate his reputation. So ... imagine me opening my front door, standing with hands cupped on either side of my mouth, shouting at the top of my lungs for all to hear, "STEVE PLOTNICKI IS A NICE GUY AND I WANT EVERYONE FROM BILL CLINTON TO C3PO TO COME TO RW99 BECAUSE IT WILL BE THE BEST EVENT EVER!" Hopefully this will satisfy all concerned and I can go back rebuilding my life.

(PX 78.) The message also asserted that he was not involved in Battlebots. (*Id.*) On March 15, Astor informed Thorpe that it believed he had violated the settlement agreement and suggested mediation, but Thorpe refused. (PX 81 at 3.)

Instead, in early 2000, Thorpe initiated an adversary proceeding in the bankruptcy court claiming Astor had not paid him the $250,000 promised under the bankruptcy settlement. Astor counterclaimed for damages of $677,000 ("the total cost of rebuilding goodwill for Robot Wars," *id.* at 4) for Thorpe's "failure to use his best efforts to rehabilitate its reputation" among robot builders. (PX 79 at 2.) The court found that Thorpe had indeed breached the settlement agreement. (*Id.* at 3.) But it made no finding on Astor's claim that Thorpe had violated the non-compete clause by conspiring with Roski to form Battlebots, and when Thorpe later sought a finding that there was no conspiracy, the court refused to go any further than to say that "there was insufficient evidence [for] a finding that there was any sort of conspiracy involving Mr. Thorpe." (PX 80 at 9.) On appeal of the damage award, however, the district court found that Thorpe had breached the Settlement Agreement not only by posting the March 13, 1999, message, but also by taking "actions to secretly form a new company." (PX 81 at 13.) The district court vacated the bankruptcy court's damages award, *Thorpe v. Profile Holdings, Inc.,* No. C 00–3761(MJJ), slip op. at 19 (N.D. Cal. June 29, 2001), but a settlement on February 6, 2002, discontinued that litigation.

### DISCUSSION

#### I. *Standard for Summary Judgment*

When adjudicating a motion for summary judgment, a court must resolve all ambiguities in favor of the nonmoving party, although "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the opposing party " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto*, 143 F.3d at 114 (quoting *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir.1998)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Pocchia v. NYNEX Corp.*, 81 F.3d 275, 277 (2d Cir.1996) (*quoting Anderson*, 477 U.S. at 252, 106 S.Ct. 2505).

II. *Elements of Tortious Interference with Contract and Aiding and Abetting Breach of Fiduciary Duty*

■ Under New York law, a plaintiff alleging tortious interference with contract must prove "the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Bar-*

*ney Inc.*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996). There is some dispute about whether a plaintiff must also show that defendant's actions were the "but for" cause of the alleged breach of contract. *See Mina Investment Holdings Ltd. v. Lefkowitz*, 184 F.R.D. 245, 252–55 (S.D.N.Y.1999) (concluding, after extensive discussion, that "but for" causation is required).[5] Astor does not challenge the existence of New York's "but for" requirement, or contend that the indisputable requirement that the defendant "procured" the breach is meaningfully different, in the context of this case, from a requirement of "but for" causation.

■ A claim for aiding and abetting a breach of fiduciary duty requires proof "(1) [of] a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Kaufman v. Cohen*, 307 A.D.2d 113, 124–25, 760 N.Y.S.2d 157, 169 (1st Dep't 2003) (citing *Wechsler v. Bowman*, 285 N.Y. 284, 291, 34 N.E.2d 322 (1941)).

III. *Summary of Thorpe's Alleged Breaches*

A. *Breaches of Contract*

The complaint alleges that Roski induced the following breaches of the Venture Agreement by Thorpe:

(1) "refusing to operate the Robot Wars business in accordance with its terms"

---

5. Some New York courts have so held, although the authorities these courts cite say nothing about such a requirement. *See, e.g., Cantor Fitzgerald Associates, L.P. v. Tradition North America, Inc.*, 299 A.D.2d 204, 749 N.Y.S.2d 249, 249 (1st Dept.2002) (relying upon Restatement of Torts § 766, which contains no "but for" language); *Washington Ave. Associates, Inc. v. Euclid Equipment, Inc.*, 229 A.D.2d 486, 645 N.Y.S.2d 511, 512 (2d Dept.1996) (citing Court of Appeals case that does not include "but for" causation re-

quirement); *Bryce v. Wilde*, 39 A.D.2d 291, 333 N.Y.S.2d 614, 616 (3d Dept.), *aff'd*, 31 N.Y.2d 882, 340 N.Y.S.2d 185, 292 N.E.2d 320 (1972) (relying on *Williams & Co. v. Collins, Tuttle & Co.*, 6 A.D.2d 302, 176 N.Y.S.2d 99, 103 (1st Dept.1958), a case involving the distinct tort of interference with prospective contract); *see also Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir.1990) (relying on federal district court decisions for "but for" causation requirement).

by making the final arrangements for Robot Wars 1997 without Astor's approval;

(2) failing to "execute a new operating agreement and ... negotiate in good faith a 'shareholders' agreement' ";

(3) "forming the Entity–in–Formation" with Roski;

(4) "fil[ing] for bankruptcy in an effort to divest [Astor] of its interest in the Robot Wars business."

(Compl. ¶ 105.) Astor's motion papers can be fairly read to supplement these allegations with two other instances of breach:

(5) "tr[ying] to force Astor to agree to a geographic split of the Venture"; and

(6) "refus[ing] to conduct any Robot Wars business" during 1998 and 1999.

(P. Rule 56.1 Statement ¶ 127(d), (e).)

With respect to the bankruptcy settlement agreement, the parties appear not to dispute, and the bankruptcy court found, that Thorpe breached it by

(7) broadcasting his dissatisfaction with the settlement and failing to "quell the strong feeling among [robot builders] that Robot Wars would be much better without [Astor]." (Compl. ¶ 98, quoting *In re Mare and Denise Thorpe*, Dkt. No. 98–11963, slip op. at 3 (N.D.Cal. Bankr.Aug. 8, 2000).)

Astor claims that Roski induced this breach as well. (Compl. ¶ 105(e).)

### B. *Breaches of Fiduciary Duties to the Venture*

The complaint does not specifically enumerate Thorpe's alleged breaches of his fiduciary duties to the Venture. From Astor's motion papers, however, can be extracted five that it alleges Roski aided and abetted, some of which overlap with the alleged breaches of contract:

(8) broadcasting the March 20, 1998, e-mail attacking Astor;

(9) refusing "to cooperate with Astor" by, among other things, refusing to "let Mentorn host Robot Wars '98" and threatening to sue Mentorn for "continuing to exploit its license" (P. Mem. at 37–38);

(10) filing for bankruptcy, moving for rejection of the Venture Agreement, and seeking the sale of the Robot Wars trademark in proposed reorganization plans, with the purpose of "divest[ing Astor] of its interest in Robot Wars" (*id.* at 38);

(11) claiming sole ownership of the Robot Wars trademark before the bankruptcy court;

(12) failing to inform Astor of "business opportunities which belonged to the Venture" (*id.* at 38), namely, an opportunity to appear on the David Letterman show.

### IV. *Grounds for Summary Judgment*

#### A. *Litigation Conduct*

Roski argues that Astor's claims relating to Thorpe's bankruptcy filing (breaches 4, 10, and 11) are barred by the California Litigation Privilege, Cal. Civ.Code § 47, as well as by the federal Noerr–Pennington doctrine. He also argues, in a supplementary letter brief filed prior to Astor's opposition papers, that these claims are barred by federal preemption doctrine. Only the latter argument has merit.

█ Astor first responds by claiming these defenses were waived when Roski failed to assert them in his answers to the complaint and the amended complaint. However, the Second Circuit has held that a district court may consider the merits of an affirmative defense – even one explicitly listed as such in Fed R. Civ. P. 8(c) – raised for the first time at the summary judgment stage, so long as the plaintiff has had an opportunity to respond.[6] *Curry v.*

---

**6.** Indeed, the District of Columbia Circuit opinion that Astor relies upon acknowledges

*City of Syracuse*, 316 F.3d 324, 330–31 (2d Cir.2003) (permitting consideration of collateral estoppel defense raised for first time in reply memorandum of summary judgment briefing, when district court had given plaintiff leave to file sur-reply).[7] Astor has had an opportunity to respond, and has in fact responded, to Roski's assertion of these defenses; accordingly, they will be considered on their merits.

 Neither the Noerr–Pennington doctrine nor the California litigation privilege are applicable to Astor's allegations. The Noerr–Pennington doctrine applies only to actions under the Sherman Antitrust Act.[8] *See Primetime 24 Joint Venture v. National Broadcasting, Co., Inc.,* 219 F.3d 92, 99 (2d Cir.2000) ("[T]he Noerr–Pennington doctrine [is] a body of caselaw constituting a limitation upon the scope of the Sherman Act."). And the

California statute does not, as Roski argues, render Roski "absolutely immune" from liability for his loan to Thorpe to hire bankruptcy counsel and his role in Thorpe's bankruptcy filings (D.Mem.20): Section 47 states only that "A privileged publication or broadcast [includes] one made ... [i]n any ... judicial proceeding [or] other official proceeding authorized by law...." The California Supreme Court has interpreted this provision narrowly:[9] The litigation privilege applies only to "a cause of action based squarely on a privileged communication, such as an action for defamation," and not "one based upon an underlying course of conduct evidenced by the communication." *White v. Western Title Ins. Co.,* 40 Cal.3d 870, 221 Cal.Rptr. 509, 710 P.2d 309, 318 (1985) (holding privilege inapplicable when plaintiff sought to "show that defendant was not evaluating

that its contrary holding is the minority view, citing cases from the Third, Sixth, Seventh, Ninth, and Tenth Circuits that have held that "parties [may] raise affirmative defenses for the first time in dispositive motions where no prejudice is shown." *Harris v. Secretary, U.S. Dep't of Veterans Affairs,* 126 F.3d 339, 344 (D.C.Cir.1997).

7. California courts, too, have held that a privilege under Cal. Civ.Code § 47 asserted for the first time in a motion for summary judgment should not be deemed waived "so long as the opposing party has adequate notice and opportunity to respond." *Cruey v. Gannett Co.,* 64 Cal.App.4th 356, 76 Cal.Rptr.2d 670, 676–77 (1998).

8. Courts have *cited* the doctrine in non-antitrust cases, but it is ultimately the First Amendment's guarantee of the right to petition the government that is being applied in those decisions. *See, e.g., Pacific Gas & Electric Co. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 270 Cal.Rptr. 1, 791 P.2d 587, 595 (1990); *Sierra Club v. Butz,* 349 F.Supp. 934, 937–38 (C.D.Cal.1972). The Court need not consider the First Amendment issue, since Thorpe's litigation conduct is not actionable for the reasons stated below, and the parties have not explicitly argued it.

9. Roski correctly cites California case law stating more broadly that "Inducing a third party to bring litigation on a meritorious claim cannot be the basis for tort liability." (D. Mem. 22), quoting *Westinghouse Elec. Corp. v. Newman & Holtzinger, P.C.,* 39 Cal. App.4th 1194, 46 Cal.Rptr.2d 151, 156 (1995). However, this states a judge-made limitation on actions for tortious interference with contract, and does not arise from the statutory litigation privilege. Although the California litigation privilege may be applicable here, *see AroChem, Inc. v. Buirkle,* 968 F.2d 266, 269–70 (2d Cir.1992), California tort law is inapplicable to this case. *See infra* section E. New York does not limit tort liability in this manner. *See Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980) (listing "civil suits" as possible "wrongful means" that can be alleged for tortious interference with prospective contractual relations); *see also Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 797 F.2d 70, 75 (2d Cir.1986) ("[I]t is clear that under New York law litigation or the threat of litigation can give rise to a claim for tortious interference with contractual relations.")

and seeking to resolve their claim fairly and in good faith"). Specifically, "while ... an ·exhortation to sue might be privileged, financing and otherwise promoting the litigation would not." *Pacific Gas & Elec.*, 270 Cal.Rptr. 1, 791 P.2d at 595. "Financing" and "promoting" fairly describe Roski's alleged role in Thorpe's bankruptcy filing and proceedings.

■ Roski is on firmer ground when he relies on a California case holding that, under *federal* preemption doctrine, "no *authorized proceeding* in bankruptcy can be questioned in a state court or used as the basis for the assertion of a tort claim in state court against any· defendant." *Choy v. Redland Ins. Co.*, 103 Cal.App.4th 789, 127 Cal.Rptr.2d 94, 103 (2002). *Choy*, like the instant case, involved allegations that the defendant induced a third party to file for bankruptcy, harming the plaintiff. While there appears to be no federal authority directly on point, the Second Circuit has suggested the broad scope of bankruptcy preemption in *Eastern Equip. & · Services Corp. v. Factory Point Nat'l Bank*, 236 F.3d 117 (2d Cir.2001). In that case, the Second Circuit held that "District courts simply lack jurisdiction to hear claims asserting violations of the automatic stay [of bankruptcy proceedings] that sound in state law." *Id.* at 120–21. While the tort claims here are not based on a violation of the automatic stay provision, the factors considered by the Second Circuit in reaching this conclusion relate to all aspects of the bankruptcy process, not just the automatic stay provision:

(1) Congress placed bankruptcy jurisdiction exclusively in the district courts under 28 U.S.C. § 1334(a); (2) Congress created a lengthy, complex and detailed Bankruptcy Code to achieve uniformity; (3) the Constitution grants Congress exclusive power over the bankruptcy law, see U.S. Const. art. I, § 8. cl. 4; (4) the Bankruptcy Code establishes several remedies designed to preclude the misuse of the bankruptcy process; and (5) the mere threat of state tort actions could prevent individuals from exercising their rights in bankruptcy, thereby disrupting the bankruptcy process.

*Id.* at 121; *see also Phoenix Elec. Contracting, Inc. v. Lovece*, Dkt. No. 93 Civ. 4340(LMM), 1993 WL 512917, at *3 n. 1 (S.D.N.Y. Dec. 9, 1993) (noting "extensive authority to support the finding that preemption is indeed at issue" when state tort claim is predicated upon the invalidity of "an action taken in a bankruptcy proceeding"); *In re Nation*, 236 B.R. 150, 155 n. 7 (S.D.N.Y.1999) ("Congress did not intend for the Bankruptcy Code to preempt all state law, but the areas where preemption does not apply are extremely limited ... Situations that threaten public health and safety have been specifically excepted from preemption by the Code." (citing *Midlantic v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 505, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986))). Just as the Bankruptcy Code contains a remedy for violations of the automatic stay, it contains remedies for "the misuse of the ... process" more generally, and thus such misuse is governed exclusively by that Code. As pointed out in *Choy*, the fact that the particular defendant in the state-law suit was not the debtor "is a distinction without a difference," 127 Cal.Rptr.2d at 103, since preemption entails that a claim that could have been made, and for which a remedy is provided, under the Bankruptcy Code cannot be the subject of regulation by state· statutory or common-law remedies.

Astor's attempt to distinguish *Choy* on the facts (P. Mem. 26 n. 21) is unconvincing, since the court there broadly posed the question as a jurisdictional one, namely, whether the plaintiff had the "right to litigate, *in state court*, the question of [the debtor's] alleged 'bad faith' bankruptcy pe-

tition." 127 Cal.Rptr.2d at 99. The Ninth Circuit, in an opinion relied upon heavily by the Second Circuit in *Eastern Equipment*, used equally sweeping language:

> [T]he adjustment of rights and duties within the bankruptcy process itself is uniquely and exclusively federal. It is very unlikely that Congress intended to permit the superimposition of state remedies on the many activities that might be undertaken in the management of the bankruptcy process.... [T]he highly complex laws needed to constitute the bankruptcy courts and regulate the rights of debtors and creditors also underscore the need to jealously guard the bankruptcy process from even slight incursions and disruptions brought about by state malicious prosecution actions.

*MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 914 (9th Cir.1996). Astor's reliance on *Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1497 (9th Cir.1995) is also misplaced, as the issue there was the collateral estoppel effect, on a subsequent federal securities fraud claim, of a finding that a plan was proposed in good faith. Thus the preemption of state tort law by federal bankruptcy laws was not an issue in *Jacobson*.

The claims that Astor has made requiring a finding that Thorpe filed for bankruptcy or filed certain papers in the bankruptcy proceedings in bad faith or for an improper purpose, as measured by the standards of New York tort law, are therefore barred. These include breaches (4), (10), and (11) above.

**B.** *Thorpe's Alleged Breaches of the Venture Agreement.*

Roski argues, by caption, that "Profile Cannot Establish *Any* Underlying Breach of the Venture Agreement By Thorpe." (D. Mem. 33 (emphasis added).)[10] This would appear to refer to any and all breaches of the Venture Agreement alleged by Astor. Under this caption, however, Roski argues only that Astor's claims in the 1997 litigation were "manufactured," and that those claims were never proven. That is, Roski only addresses Thorpe's allegedly unauthorized arrangements for Robot Wars '97, or breach (1) noted above. Because, as discussed below, the record is devoid of evidence that Roski had anything to do with Thorpe's conduct leading up to Robot Wars '97, it will be unnecessary to consider the logically prior, but more difficult, question of whether Thorpe actually breached the Agreement.

Although Roski does not address the other alleged breaches of the Venture Agreement in his memorandum, breaches (4) and (5) can be easily disposed of. As noted above, no liability can attach to Thorpe's filing for bankruptcy because the Bankruptcy Code preempts any state-law remedy for improper bankruptcy filings. And the factual record provides no support for Astor's assertion that Thorpe "tried to force" Astor to accept a "geographical split" of the Venture; the evidence Astor relies on is the testimony of its own president, Steve Plotnicki, who in fact stated only that Thorpe "proposed" a geographical split. (PX 57 ¶ 12.) The remaining alleged breaches require more extended analysis.

1. *Thorpe's failure to negotiate in good faith and execute a new operating agreement (Breach 2)*

■ The record could support an inference that Thorpe, beginning in August 1997, did not in good faith negotiate a corporate operating agreement, as required by the Venture Agreement. (*See* DX 63; PX 29; PX 38 at 2.) However, Thorpe's failure to *actually execute* the

---

**10.** Roski does not dispute that Thorpe breached the bankruptcy settlement agreement; that

breach has already been established in the bankruptcy proceedings.

August 1997 settlement agreement, or any other draft, could not be a breach of the Venture Agreement since the Agreement only requires good-faith negotiation, not the signing of any particular agreement. The term of the Venture Agreement requiring good-faith negotiations would appear to be what under New York law is called a "binding preliminary commitment." *See Missigman v. USI Northeast, Inc.*, 131 F.Supp.2d 495, 507 (S.D.N.Y. 2001). Under such a commitment, the parties "ha[ve] no right to demand performance of the ultimate transaction." *Id.*

### 2. Thorpe's negotiations involving the "entity-in-formation" (Breach 3)

The April 1998 deal sheets evidencing Thorpe's contemplated conveyance of half his interest in Robot Wars to Roski provide some support for Astor's claim that Thorpe breached the non-compete clause of the Venture Agreement. In that clause, Thorpe had promised not to "solicit, negotiate, seek to enter or enter into an agreement (other than through the Venture) with respect to matters which come within the scope of the Venture as set forth in paragraph 1." (PX 2 ¶ 2(a).) The term sheets, which Roski agrees were transmitted to him, are direct evidence that Thorpe at least solicited an agreement. The terms themselves indicate that the agreement might have taken place "other than through the Venture," since the earlier term sheet explicitly provided for Roski providing "legal resources for a dissolution action," and the later one provides for Roski's "[l]egal support to conclusion of deal or litigation if necessary." (PX 70 at 1, 3.) Finally, while many of the suggested deal terms did not involve "matters . . . within the scope of the Venture," the April 8 term sheet contemplates, as part of Roski's consideration for obtaining a share Robot Wars, a "[g]uarantee [of] funding for [live] events up to $100 K per event." (*Id.* at 3.) Financing of live events clearly comes within the "scope of the Venture" since the definition of the Venture's scope includes "creating and seeking events . . . through which to develop and exploit Robots produced by the Venture." (PX 2 ¶ 1(a).) Accordingly, a reasonable factfinder could infer that Thorpe was effectively attempting to set up a distinct, and therefore competing, entity for producing Robot Wars-type events.

### 3. Thorpe's "refus[al] to conduct any Robot Wars business" (Breach 6)

This claim is vague, but appears to be based either on Thorpe's failure to negotiate the terms of a new operating agreement with Astor, which is the same as breach (2) and addressed above, or on Thorpe's "refus[al] to cooperate with Astor [by a]mong other things . . . not let[ting] Mentorn host Robot Wars '98" and Thorpe's "[c]asting [of] a[c]loud" on the Robot Wars trademark by sending a "cease and desist letter" to Mentorn (P. Mem.37–38), which is the same as breach of fiduciary duty (9).

Roski replies to these assertions by insisting that (1) "There is absolutely no evidence that Roski ever encouraged Thorpe . . . to deadlock the Robot Wars business, to create a cloud on the Robot Wars trademark . . . or to otherwise interfere with the Venture Agreement"; (2) the "occurrence of telephone conversations" and Astor's reliance on "one-way written communications *from* Thorpe *to* Roski or his attorneys" is insufficient to defeat summary judgment, and (3) Astor itself "refused corporate opportunities [and] sought to prevent the Robot Wars '97 and '98 events from going forward." (D. Reply 13–14.)

Astor is ill-situated to complain of any obstacles Thorpe placed in the way of its arrangements for Robot Wars '98. Astor, rightly or wrongly, refused, as early as October 1997, to grant Thorpe a license to

hold the 1998 event. And Astor insisted, beginning in July 1997, on strict enforcement of the Agreement's term requiring mutual consent before any Venture-related agreements were entered into – consent which Astor apparently believed could be freely withheld. Having taken those positions, which appear to be reasonable interpretations of the Venture Agreement, Astor cannot now claim that similar conduct by Thorpe was a breach of any contractual (or fiduciary) duty to Astor or the Venture.

## C. Leppo's 1997 Loans

■ In its complaint, Astor refers to the undisputed fact that Robert Leppo, a venture capitalist and eventual sponsor of Battlebots, loaned money to Thorpe in 1997 to assist him in producing Robot Wars '97, and appears to set the stage for charging Leppo, as well as Roski, with the torts alleged here. (Compl.¶¶ 16–20.) Since Leppo is not named as a defendant in this action, these allegations have significance only if his actions can be attributed to either Roski or Battlebots. However, Astor has alleged no agency relationship between Roski and Leppo, and, as Roski points out, Battlebots cannot be held liable for tortious conduct that took place prior to its incorporation in February 1999. *See Pioli v. Town of Kirkwood,* 117 A.D.2d 954, 499 N.Y.S.2d 266, 267 (3d Dept.1986). In any case, Astor makes no response to the latter point, so the Court deems abandoned any claim Astor may have intended to assert with respect to Leppo's 1997 loan.

## D. Roski's Role in Thorpe's Breaches

Surviving at this point are Astor's claims respecting breaches (1), (2), (3), (7), (8), and (12). Roski maintains that there is insufficient evidence for any reasonable jury to find that he was in any way responsible for these (or any other) breaches by Thorpe.[11]

### 1. Thorpe's secret arrangements for Robot Wars '97 (Breach 1)

There is no evidence to support Astor's claim that Roski had any influence on Thorpe's allegedly secret 1997 arrangements for holding Robot Wars '97 without Astor's consent.[12] Astor alleges that "Ro-

---

11. At the threshold, Roski argues that Astor's claims for aiding and abetting breach of fiduciary duty fail "because neither Roski nor Battlebots owed a fiduciary duty to Profile." (D.Mem.32.) Roski cites California law that "[a] nonfiduciary cannot conspire to breach a duty owed only by a fiduciary." (*Id.* quoting *Kidron v. Movie Acquisition Corp.,* 40 Cal. App.4th 1571, 47 Cal.Rptr.2d 752, 768 (1995).) Having argued the New York statute of limitations as a defense against all of Astor's tort claims, Roski may not shift to California law when it suits his cause to do so. Furthermore, as Astor points out, it is now the law of the case that New York law governs this tort claim. *Astor,* 2002 WL 72936 at *10 ("[T]he actions alleged . . . are directed to a duty established, governed and enforced by New York law."). As set forth above, New York recognizes a claim for aiding an abetting a fiduciary breach. *See Wechsler,* 285 N.Y. at 291, 34 N.E.2d 322. Roski proffers no response in his reply papers, and thus appears to have abandoned this ground for summary judgment.

12. Roski does not actually address this in his memorandum of law, but the parties do dispute Roski's role in Thorpe's 1997 breaches in their respective statements of facts. (D. Rule 56.1 Counter–Statement ¶ 19.) In his Memorandum of Law, Roski instead argues only that any claims based upon his conduct in 1997 are time-barred. That defense, and Astor's response that the statute of limitations was tolled by Roski's concealment of his role, need not be addressed here in view of the finding that he played no role at all. To the extent that Roski believes that the statute of limitations defense, if successful, would bar *all* of Astor's claims (*see* D. Mem. 16), Astor is correct that any conduct by Roski that played a role in Thorpe's later breaches must be treated separately for statute of limitations purposes. (P. Mem. 22–23 (citing cases).)

ski provided financial support for Thorpe's [unauthorized arrangements] by actively soliciting sponsors" for the 1997 live event. (P. Rule 56.1 Statement ¶ 19; *see also* P. Mem. 5.) Roski counters that "[t]he uncontroverted documentary evidence establishes [that] Roski sought sponsors [in 1997] predominantly for his own robot ... as he had done in the past." (D. Counter–Statement ¶ 19.) Roski is correct; there is no evidence that Roski sought sponsors for the purpose of financing the event, such that Thorpe was thereby enabled or induced to make the final arrangements without Astor's approval. In one letter to a potential sponsor, Roski wrote: "Thank you for your interest in sponsoring Team La Machine in it's [sic] endeavor to be victorious at Robot Wars 1997." (DX 23.) The other solicitations in the record are equally clear as to Roski's interests. (*See* DX 25, 26, 129.) Since Astor has neither argued nor presented any evidence that Roski secretly intended to divert the funds he received for his "team" into the Robot Wars Venture itself, so as to enable the event to proceed, or that Thorpe was led to believe that such was Roski's intent, Roski's motion for summary judgment will be granted as to any involvement he had with Thorpe's arrangements for Robot Wars '97.

### 2. Thorpe's failure to negotiate or execute an operating agreement (Breach 2)

Roski argues that "it is uncontroverted that Roski *never* encouraged Thorpe not to sign an operating agreement for the Venture or any other corporate documents." (D.Mem.30.) This is incorrect. While it is true that Astor does not present any direct evidence of such encouragement in the form of contemporaneous statements or documents by Roski, Roski neglects the impact of the circumstantial evidence indicating that he was keenly interested and involved in, or got his lawyers involved in, Thorpe's negotiations. Beginning in July 1997, Roski was in frequent contact not only with Thorpe (who, as Roski points out, had been Roski's friend for some time), but also with Thorpe's transactional attorney, William Scherer. (PX 16.) The record supports an inference that Roski, beginning at least in early March 1998, facilitated Thorpe's contact with attorneys at Latham and encouraged Thorpe to share with Roski's father and Latham all of his correspondence with Astor. (PX 26–27, 34, 36–44.) Rogers, a Latham attorney representing Roski, apparently informed Thorpe that the Venture Agreement was "obscene." (Rogers Tr. 185.) This evidence is sufficient to cast doubt upon the credibility of Roski's self-serving statements that Thorpe's sharing of correspondence with Roski's attorneys was entirely on Thorpe's own initiative and that Roski "did not want to have any part in dealing or negotiating with Thorpe, because Thorpe had yet to resolve his disputes with [Astor]." (Roski Aff. ¶ 16, 25.)

However, Astor provides no evidence that Roski was in any way involved with Thorpe's strategy for dealing with Astor prior to July 1997. It relies extensively on a fax Thorpe sent to Leppo on April 2, 1997, following up on their meeting the day before. Thorpe's fax, however, makes no reference to Roski, and, with respect to the negotiations with Astor, states simply that "as I was eating an ice cream cone with my daughter ... I knew that the right choice for me was to stay the course and pursue [the 1997 live event] without signing the agreement as it stands." (PX 10.) The fax, if anything, undercuts Astor's claim that Roski substantially influenced or assisted Thorpe at that time, since it suggests that Thorpe made a spontaneous decision, perhaps inspired by Leppo, based on his own perceived best interests. The earliest evidence Astor cites actually tending to show any involvement by Roski consists of telephone records

showing contact among Roski's father, Thorpe, and Thorpe's attorney William Scherer beginning on July 21, 1997 – three days after Astor sent its cease-and-desist letter to Scherer threatening litigation over Thorpe's arrangements for Robot Wars '97 (PX 15). During one of these conversations, on July 25, Roski's father apparently offered Thorpe his support. (PX 17, 18.) Thus, Roski cannot be found liable for any injuries traceable to Thorpe's negotiating posture before July 1997.

█ Roski's argument that he could not have been the "but for" cause of Thorpe's negotiating posture because Thorpe, as early as 1996, had resisted signing any operating agreement, is more compelling than his blanket denial of any influence. (D.Mem.31.) An attorney involved in the negotiations testified that, although Thorpe and Astor appeared to be close to an agreement in late 1995, it later appeared to him that "Mr. Thorpe didn't want to sign any agreements" and "it seemed to be more a situation where new issues kept being raised by him on an ongoing basis." (Friedman Tr., DX 122, at 27).[13] Notwithstanding this consistency in Thorpe's negotiation style, whether or not Roski played a pivotal role in Thorpe's negotiating posture beginning in July 1997 remains a triable issue of fact. The record supports Astor's claim that Roski and his attorneys were involved and interested in Thorpe's legal dispute with Astor, and that there was significant communication between Roski and Thorpe. A reasonable fact-finder could infer that, absent the involvement and support of Roski, Thorpe would ultimately have signed an operating agreement with Astor rather than remain in stalemate, unable to hold any live events. Thus whether Roski was the "but for" cause of Thorpe's alleged refusal to negotiate in good faith with Astor after July 1997 involves, in part, determination of Thorpe's state of mind, a determination usually inappropriate at the summary judgment stage. *Gelb v. Board of Elections of City of New York*, 224 F.3d 149, 157 (2d Cir.2000). Therefore, summary judgment will not be granted with respect to Roski's role in the negotiations after July 1997.

### 3. Thorpe's negotiations involving the "entity-in-formation" (Breach 3)

Roski denies any affirmative involvement in the deal proposals contained in the April 2 and April 8, 1998 term sheets, claiming that he "never drafted, revised, or agreed to the deal terms Thorpe sent [him]," that he did not "recall even discussing [them] with Thorpe in any detail," that he "never responded to Thorpe's proposals by revisions ... or otherwise," and that he didn't even "want to have any part in dealing or negotiating with Thorpe, because Thorpe had yet to resolve his disputes with [Astor]." (Roski Aff. ¶¶ 24–25.) Thorpe only partially corroborated this version of the facts at deposition, stating that he discussed the deal with Roski "in broad terms, probably," that he didn't know if he discussed the issue of legal support for a dissolution action, but that he "pretty much put this together by myself." (Thorpe 9/19/02 Tr., DX 119, at 139–40.)

The credibility of Roski's testimony might be questioned by a rational fact-finder based upon several facts: (1) There are two term sheets, one composed six days after the other, with substantially

---

**13.** Astor comments, in a footnote, that "Since neither of Astor's claims is based on anything that occurred prior to 1997, defendants' discussion of this period is beside the point." This is incorrect; it is a rare lawsuit that can be resolved without reference to events prior to the acts plaintiff complains of.

different terms, suggesting that some sort of negotiation or discussion took place after Thorpe sent Roski the first one. That Roski made six calls to Thorpe on April 3 and 4, one of them quite lengthy, is circumstantial evidence that such discussion took place. (PX 33.) (2) The proposals as evidenced by the contemporaneous term sheets and the proposals as described by Roski in his affidavit prepared for this litigation are inconsistent. Roski states in his affidavit that "the deals Thorpe proposed necessarily were predicated on Thorpe's resolution of his dispute with Profile and Profile's consent," and that they were deals simply "to stage the live events under a license from [Astor]." (Roski Aff. ¶¶ 24–25.) As noted above, however, the deal terms included the possibility of Roski providing "legal resources for a dissolution action" and the "defense of [Thorpe] from any legal action brought by Plotnicki." (PX 70 at 1.) Furthermore, only the second term sheet makes any reference to live events. (Id. at 3.) (3) Roski's claim that he refused to negotiate or deal with Thorpe altogether is unsupported by any contemporaneous evidence.

This record leaves ample room for a fact-finder to conclude that absent Roski's involvement, Thorpe would not have solicited or negotiated the kind of deal outlined in the term sheets. Thus Roski's motion for summary judgment will be denied as to Astor's claims based upon the "entity-information."

### 4. Thorpe's March 20, 1998, e-mail (Breach 8)

██ In a footnote, Roski argues that "evidence clearly demonstrates that Roski was not involved in any emails sent by Thorpe to the Robot Wars contestants at any time," citing Thorpe's own deposition testimony. (D. Mem. 32 n. 26.) Apart from Thorpe's statements on behalf of his friend during this litigation, the testimony of Rogers, relied upon by Astor (P. Mem.37),

fails to advance its claim that Roski played a role in this breach of Thorpe's fiduciary duty. Rogers, in answering questions about the circumstances under which the March 20 e-mail was sent, stated that Thorpe and Roski "were disappointed about their event not going forward and they had communicated to the event participants." (Rogers Tr. 53.) This supports an inference that Roski was involved in the decision to send an email for the purpose of cancelling Robot Wars '98. But cancelling the event was not a breach of Thorpe's fiduciary duty; on the contrary, Thorpe was complying with Astor's refusal to permit the event to go forward, and he was acting appropriately in informing participants that there would be no event. The breach, if any, was in the content of the e-mail, and there is nothing in the record tending to show that Roski had anything to do with that. Rogers stated that the e-mail was not a "collaboration," and that he did not know whether Roski was even "consulted" by Thorpe prior to its transmission or whether it "reflected the intention of both Mr. Thorpe and Trey Roski." (Id. at 54.)

The evidence that the e-mail "followed two hours of ... telephone discussions between Thorpe and Roski" (P. Mem.37) simply establishes that Roski had an opportunity to influence Thorpe at the relevant time; in the absence of any evidence of the content of those conversations, one could as easily imagine that Roski sought to dissuade Thorpe from alienating Astor as that he encouraged him to. Indeed, Astor does not present any argument as to why Roski would be motivated to encourage Thorpe to openly criticize Astor or the Robot Wars venture, particularly in light of his hope, through at least December 1998, that he would be able to obtain a license to hold live events using the Robot Wars trademark. (See, e.g., Fierst Tr. 26–30.) In the absence of any evidence tend-

ing to show that Roski influenced those aspects of Thorpe's e-mail that represent a breach of Thorpe's fiduciary duties, Roski's motion for summary judgment must be granted as to that claim.[14]

### 5. Failure to disclose business opportunities to the Venture (Breach 12)

■ As to Astor's claim that "Thorpe disclosed to Roski business opportunities which belonged to the Venture," there is self-serving but uncontradicted evidence that the opportunity, a segment on the David Letterman show, quickly evaporated. (Thorpe Decl. ¶ 21.) Therefore, Astor can show no damage from Thorpe's failure to disclose it; nor, given the "few days" that elapsed before the Letterman show cancelled the appearance, could Astor demonstrate that Thorpe intended to conceal the opportunity should it have remained open for a substantial period of time. Nor is there any evidence that Roski played any role in Thorpe's failure to disclose the Letterman overture to Astor.

### 6. Thorpe's breach of the bankruptcy settlement (Breach 7)

Astor claims that Roski, having failed to acquire any interest in Robot Wars and having decided to form his own competing venture, Battlebots, set out to undermine the bankruptcy settlement, and Robot Wars itself, by causing Thorpe to renege on the promise to "promote" Robot Wars. Perhaps to demonstrate that this was Roski's intent, Astor claims that Roski "deliberately [took] steps to ensure that information about the settlement was circulated in a way that would make it impossible for Thorpe to succeed." [15] (Compl.¶ 72.) Specifically, it alleges, with some support in the record, that Roski's alleged dissemination of information about the settlement was responsible for Cline's February 3, 1999, e-mail attacking the settlement. (Id. ¶ 71; PX 74; Cline 8/26/99 Tr. 107–09.)

Astor claims that Roski and Battlebots induced Thorpe's breaches of the settlement agreement – his general failure to promote Robot Wars and his own March 13, 1999, e-mail broadcast damning Astor with faint and sarcastic praise – by (1) telling Thorpe that Astor would not live up to its obligations under the settlement agreement (Fierst Tr. 42), and (2) procuring employment for Thorpe, beginning on March 10, 1999, in the form of a commission from Battlebots sponsor Leppo to produce a "beauty video" (which Thorpe in fact did produce) in return for payments totaling $45,000 (PX 76). It cites as further circumstantial evidence of Roski's interference (1) the fact that he continued to have frequent telephone communication with Thorpe (PX 69); (2) the fact that

---

**14.** This is not inconsistent with the conclusion, reached earlier, that the record could support Astor's claim that Roski wanted to and did influence certain breaches of the Venture Agreement by Thorpe. The "entity in formation" proposals and Thorpe's refusal to negotiate in good faith were not public transactions that immediately compromised the value of Astor's property; they were open-ended dealings that, notwithstanding that they may have been a breach of Thorpe's promises, may or may not have resulted in any injury to Astor. Thus Roski could easily have been motivated to procure those breaches by Thorpe while being completely uninterested or opposed to Thorpe's public condemnation of Astor.

**15.** Roski argues that "disclosure of the [bankruptcy] settlement terms cannot possibly constitute an act of interference with the Bankruptcy Settlement." (D.Mem.38–39.) Astor proffers no response to Roski's sensible argument that the First Amendment protects Roski from any liability for a communication that was neither defamatory nor in violation of any confidentiality obligation. As noted, however, the Court reads Astor's allegations that Roski disclosed the settlement as putative evidence of his intent, rather than as an asserted independent ground for liability.

Leppo and Thorpe's initial discussions of the beauty video project took place three days before the announcement of the formation of Battlebots on February 22, 1999 (PX 5 at 33); and (3) the fact that Roski and Thorpe "sat side-by-side" at the bankruptcy hearing where the settlement was approved.

Since Thorpe was entitled to a quarter million dollars if he assisted Astor in promoting Robot Wars, a reasonable jury might well conclude that but for Roski's assurance that Astor would never pay him, and but for the proceeds (however meager in comparison) from the beauty video project, Thorpe would not have gone out of his way to undermine Astor, rather than comply with an agreement that promised him a substantial economic benefit. Evidence that Thorpe actually made the video and tried to market it, that he received from that project only a fraction of what he would have received under the bankruptcy settlement agreement, and that the payments were not concealed from Astor might well lead a jury to conclude that the video project was unrelated to the Robot Wars rivalry, and to reject Astor's argument that these actions contributed to Thorpe's decision to breach the agreement. But that is a factual issue for the jury.

### E. Recovery of Attorneys' Fees

Roski argues that because Astor has not provided unredacted invoices and billing statements relating to its attorneys' fees in the two underlying court proceedings – the 1997 lawsuit and the bankruptcy proceedings – it should be denied those fees as part of any award of compensatory damages. Because Roski is being granted summary judgment as to any claims arising from the these proceedings, this issue is moot.

### CONCLUSION

For the reasons stated above, Roski's motion for summary judgment is GRANT-

ED as to Astor's claim of aiding and abetting breach of fiduciary duty. The motion is DENIED as to the claim of tortious interference with contract, limited to:

1. Astor's claims of tortious interference with the Venture Agreement based on Thorpe's failure to negotiate in good faith towards an operating agreement after July 1998 and on Thorpe's and Roski's alleged negotiations relating to the "entity-in-formation"; and

2. Astor's claim of tortious interference with the bankruptcy settlement based on Thorpe's failure to otherwise promote Robot Wars and his broadcasting of the March 13, 1999, e-mail.

SO ORDERED.