In re OLD CARCO LLC (f/k/a Chrysler LLC), et al., Debtors.

Old Carco LLC (f/k/a Chrysler LLC); Old Carco Motors LLC; Chrysler Group LLC; and Old Carco Liquidation Trust, Plaintiffs,

v.

John Kroger, Oregon Attorney General; Matthew Garrett, Director of Oregon Department of Transportation; Matthew Dunlap, Maine Secretary of State; John McCurry, Chairman of the Maine Motor Vehicles Franchise Board; Jesse White, Illinois Secretary of State; and Terrence M. O'Brien, Chairperson of Illinois Motor Vehicle Review Board, Defendants.

Bankruptcy Nos. 10 Civ. 1231 (PKC), 09–50002 (AJG). Adversary No. 09–00511.

United States District Court, S.D. New York.

Dec. 6, 2010.

Corinne Ball, Jones Day, New York City, for Plaintiffs.

Ann W. Matthews, Raleigh, NC, James D. Newbold, Chicago, IL, Carolyn G. Wade, Salem, OR, Elizabeth J. Wyman, Augusta, ME, for Defendants.

## MEMORANDUM AND ORDER

CASTEL, District Judge.

The plaintiffs in this action assert that certain state statutes directed toward the relationships between vehicle manufacturers and their dealership franchises violate the Supremacy Clause because they are contrary to provisions of the federal Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, as well as the orders of the bankruptcy court in *In re Old Carco LLC (f/k/a Chrysler LLC), et al.,* Case No. 09–50002 (AJG) (the "Bankruptcy Court"). Separately, the plaintiffs contend that the statutes unlawfully interfere with the parties' reasonable contractual expectations, thereby violating the Contract Clause of the Constitution. In a Memorandum and Order dated March 26, 2010, this Court withdrew the automatic reference to the Bankruptcy Court, concluding that non-core issues of federal law predominated. (Docket # 9.) The plaintiffs move for summary judgment in their favor, and officials from the state of Illinois move to dismiss the Complaint.

For the reasons explained below, plaintiff's motion for summary judgment is granted as to the claim of preemption under the Supremacy Clause against the Illinois and Maine defendants. The summary judgment motion is denied as to the Oregon defendants. The motion to dismiss filed by the Illinois defendants also is denied. I do not reach the plaintiff's Contract Clause claim, as it is unnecessary to do so.

BACKGROUND

The facts of this case are largely undisputed. Except as noted, the facts asserted by the plaintiffs, as they are set forth below, are admitted by all defendants. Every reasonable inference is drawn in favor of the non-moving parties. *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995).

Plaintiffs Old Carco and Old Carco Motors (collectively, the "Debtor Plaintiffs") are, along with twenty-four of their affiliates, debtors in the above-captioned Chapter 11 bankruptcy proceedings. (Pl. 56.1 ¶ 1; Ill. 56.1 Opp. ¶ 1; Me. 56.1 Opp. ¶ 1; Or. 56.1 Opp. ¶ 1.) Old Carco formerly manufactured Chrysler, Jeep and Dodge brand vehicles, with Old Carco Motors acting as distributor to authorized dealers in the United States. (Pl. 56.1 202; Ill. 56.1 Opp. ¶ 2; Me. 56.1 Opp. ¶ 2; Or. 56.1 Opp. ¶ 2.) Plaintiff Chrysler Group LLC ("New

Chrysler") is a newly created entity that assumed certain liabilities of Chrysler debtors, including non-parties to this action. (Pl. 56.1 ¶ 4; Ill. 56.1 Opp. ¶ 4; Me. 56.1 Opp. ¶ 4; Or. 56.1 Opp. ¶ 4.) New Chrysler both manufactures and distributes the Chrysler, Jeep and Dodge vehicle brands. (Pl. 56.1 ¶ 4; Ill 56.1 Opp. ¶ 4; Me. 56.1 Opp. ¶ 4; Or. 56.1 Opp. ¶ 4.) It is not a debtor in the bankruptcy action.

Three separate rulings of the Bankruptcy Court are relevant to the preemption claim. Each of these rulings bears on the plaintiffs' obligations to vehicle dealership franchises, the state-law regimes that govern relations between manufacturers, distributors and dealers, and the nexus between the Bankruptcy Code and state dealer laws.

### A. *The Sale Opinion and the Sale Order.*

The Debtor Plaintiffs entered into a purchase agreement with New Chrysler and Fiat S.p.A ("Fiat") dated April 30, 2009 (the "Purchase Agreement"). (Pl. 56.1 ¶ 3; Ill. 56.1 Opp. ¶ 3; Me. 56.1 Opp. ¶ 3; Or. 56.1 Opp. ¶ 3.) As summarized in an opinion of the Bankruptcy Court approving the transaction, New Chrysler acquired the debtors' assets and liabilities for $2 billion, while Fiat acquired an ownership interest in New Chrysler and provided it with technological support. *In re Chrysler, LLC,* 405 B.R. 84, 92 (Bankr.S.D.N.Y.2009). On May 3, 2009, all Chrysler debtors filed a motion in the Bankruptcy Court for the approval of the Purchase Agreement. (Pl. 56.1 ¶ 12; Ill. 56.1 Opp. ¶ 12; Me. 56.1 Opp. ¶ 12; Or. 56.1 Opp. ¶ 12.) Several state attorneys general objected. (Pl. 56.1 ¶ 21; Ill. 56.1 Opp. ¶ 21; Me. 56.1 Opp. ¶ 21; Or. 56.1 Opp. ¶ 21.) The Bankruptcy Court approved the Purchase Agreement and the underlying transaction in a written opinion (the "Sale Opinion"), which, among

other things, concluded that if the transaction did not proceed, the debtors would likely be forced into immediate liquidation. *In re Chrysler LLC,* 405 B.R. at 96. The Sale Opinion was accompanied by a separate order that approved the transaction (the "Sale Order"). (Pl. 56.1 ¶¶ 13–14; Ill. 56.1 Opp. ¶¶ 13–14; Me. 56.1 Opp. ¶¶ 13–14; Or. 56.1 Opp. ¶¶ 13–14.) The Sale Opinion and Sale Order were affirmed by the United States Court of Appeals for the Second Circuit. *See In re Chrysler, LLC,* 592 F.3d 370, 372 (2d Cir.2010). (Pl. 56.1 ¶ 14; Ill. 56.1 Opp. ¶ 14; Me. 56.1 Opp. ¶ 14; Or. 56.1 Opp. ¶ 14.)

### B. *The Assumed Agreements and the Rejected Dealer Agreements.*

Pursuant to the Purchase Agreement and the Sale Order, New Chrysler's "purchased assets" included assumed and assigned dealer agreements for Chrysler, Dodge and Jeep vehicle lines (the "Assumed Agreements"). (Pl. 56.1 ¶ 15; Ill. 56.1 Opp. ¶ 15; Me. 56.1 Opp. ¶ 15; Or. 56.1 Opp. ¶ 15.) Certain dealer agreements were not assumed by New Chrysler (the "Rejected Dealer Agreements"), and New Chrysler filed with the Bankruptcy Court a motion to confirm its assumption and rejection of the agreements. (Pl. 56.1 ¶¶ 16–17; Ill. 56.1 Opp. ¶¶ 16–17; Me. 56.1 Opp. ¶¶ 16–17; Or. 56.1 Opp. ¶¶ 16–17.) Again, certain state attorneys general objected to the motion and participated in the related hearings. (Pl. 56.1 ¶ 21; Ill. 56.1 Opp. ¶ 21; Me. 56.1 Opp. ¶ 21; Or. 56.1 Opp. ¶ 21.) In particular, defendant Jesse White, who is the Illinois Secretary of State, filed an "extensive objection," and argued that Illinois laws, which were intended to protect the state's vehicle dealers, did not allow for the Rejected Dealer Agreements. (Pl. 56.1 ¶ 22; Ill. 56.1 Opp. ¶ 22; Me. 56.1 Opp. ¶ 22; Or. 56.1 Opp. ¶ 2.) White also argued that the section of the Bankruptcy Code permitting a bankruptcy court to reject executory contracts,

11 U.S.C. § 365, did not preempt the Illinois dealership laws. (Pl. 56.1 ¶ 22; Ill. 56.1 Opp. 122; Me. 56.1 Opp. ¶ 22; Or. 56.1 Opp. 122.)

On June 9, 2009, following argument and an evidentiary hearing, the Bankruptcy Court entered an order, pursuant to 11 U.S.C. §§ 105 and 365, that authorized the debtors' rejection of the executory contracts and unexpired leases with the Rejected Dealers (the "Rejection Order"). (Pl. 56.1 ¶ 17; Ill. 56.1 Opp. ¶ 17; Me. 56.1 Opp. ¶ 17; Or. 56.1 Opp. 17.) On June 19, 2009, the Bankruptcy Court issued an opinion explaining the basis for the Rejection Order, particularly as to the debtors' "persuasive showing" that the rejection of existing dealer contracts would benefit the estate and was the product of sound business judgment. *In re Old Carco LLC,* 406 B.R. 180, 192, 194–99 (Bankr.S.D.N.Y. 2009).[1] The Bankruptcy Court held that while the state laws intended to grant protection to dealer franchises may have been adopted in the public interest, they did not account for the national interest embodied in federal bankruptcy laws, and were not adopted to protect the states' citizens from imminent threats to health or safety. *Id.* at 189–91. The Bankruptcy Court concluded that application of the state statutes would obstruct federal bankruptcy adjudication, specifically as to the Bankruptcy Court's power to reject executor contracts under 11 U.S.C. § 365, and that the state laws were preempted. *Id.* at 199–207.

### C. Preemption of Rejected–Dealer Claims Brought Under State Law.

On August 13, 2009, the debtors and New Chrysler filed a joint motion in the Bankruptcy Court to enjoin legal actions brought by Rejected Dealers in Arkansas, Ohio and Wisconsin as contrary to the Sale Order, the Sale Opinion, the Rejection Order and the Rejection Opinion, as well as the Bankruptcy Code's automatic stay provision, 11 U.S.C. § 362. (Pl. 56.1 ¶ 25; Ill. 56.1 Opp. ¶ 25; Me. 56.1 Opp. ¶ 25; Or. 56.1 Opp. ¶ 25.) In an unpublished opinion dated August 31, 2009. the Bankruptcy Court held that the Sale Order barred the dealers' lawsuits, since the Sale Order "clearly prohibited any successor or transferee liabilities against New Chrysler." (Compl. Ex. F at 5–6.) The Bankruptcy Court stated that "a crucial condition" of its approval of the Fiat transaction was that New Chrysler would not be required to assume all then-existing dealer agreements, and it concluded that the actions against New Chrysler brought pursuant to the state franchise laws were "enjoined by the Sale Order." (Compl. Ex. F at 6.)

The Bankruptcy Court also held that the state franchise laws were "preempted by the Bankruptcy Code to the extent that the enforcement of such laws conflict with the terms of the Sale Order or the impact of the rejection of the rejected agreements." (Compl. Ex. F at 7.) It noted that the Rejection Order stated that the Rejected Dealers "shall have no further rights (direct, indirect, contractual or otherwise) to act as an Authorized Dealer...." (Compl. Ex. F. at 7.) The dealers' legal actions, the Bankruptcy Court held,

> are in direct conflict with the terms of the Rejection Order because the Dealers are seeking to burden New Chrysler with the obligation of either continuing

---

**1.** The Rejection Order and Rejection Opinion were never appealed, although more than six months after the order and opinion were filed, certain Rejected Dealers filed a motion to reconsider, which the Bankruptcy Court denied. *In re Old Carco LLC,* 423 B.R. 40 (Bankr.S.D.N.Y.2010). Judge Hellerstein of this Court affirmed the denial of that motion. *In re Old Carco LLC,* 2010 WL 3566908 (S.D.N.Y. Sept.14, 2010).

the previously rejected dealer agreements or suffering other unfavorable consequences as a result of the rejected dealer agreements. The Rejection Order ended the Dealers' right to act as authorized dealers while the Wisconsin, Ohio and Arkansas statutes resurrect precisely those rights and compel New Chrysler, the successor/transferee of Debtors, to resume the dealer agreements. As there is a direct conflict between the Rejection Order and the statutes under which the Subject Actions are based, the state statutes are preempted under the Rejection Order and the Dealers are enjoined under the Sale Order from bringing any actions pursuant to these statutes in any court. (Compl. Ex. F at 8.) The Bankruptcy Court further held that because the state lawsuits "would undermine and frustrate the benefit achieved through the rejection process, such statutes were preempted." (Compl. Ex. F at 9.) In an unpublished memorandum and order dated July 2, 2010, Judge McMahon affirmed the Bankruptcy Court's opinion. *In re Old Carco Liquidation Trust*, 09 Civ. 8875(CM) (S.D.N.Y. July 2, 2010) (Docket # 35).

### D.  *Allegations in the Present Action.*

The Complaint asserts that federal preemption bars state officials from enforcing certain dealership laws, and seeks declaratory and injunctive relief. In June 2009, the states of Maine and Oregon each enacted amendments pertaining to the obligations owed by vehicle manufacturers and distributors to franchises and dealers. (Pl. 56.1 ¶¶ 27–28; Ill. 56.1 Opp. ¶¶ 27–28; Me. 56.1 Opp. ¶¶ 27–28; Or. 56.1 Opp. ¶¶ 27–28.) Illinois passed similar amendments in November 2009. (Pl. 56.1 ¶ 29; Ill. 56.1

Opp. f 29; Me. 56.1 Opp. ¶ 29; Or. 56.1 Opp. ¶ 29.) The defendants are government officials of the states of Illinois, Maine and Oregon, whose responsibilities include the enforcement of state automobile dealer laws. (Pl. 56.1 ¶¶ 5–11; Ill. 56.1 Opp. ¶¶ 5–11; Me. 56.1 Opp. ¶¶ 5–11; Or. 56.1 Opp. ¶¶ 5–11.) As discussed in greater detail below, these state dealer amendments granted protections to preexisting dealerships in the event that a manufacturer or distributor were to contract with a new or different dealership in the same geographic area.

On December 31, 2009, the Debtors and New Chrysler filed a Complaint in the Bankruptcy Court, asserting that the Bankruptcy Code and the final orders of the Bankruptcy Court preempt the dealer amendments of Maine, Oregon and Illinois.[2] The Debtor Plaintiffs and New Chrysler also allege that the state dealer laws violate the Contract Clause of the U.S. Constitution, U.S. Const. art. I, § 10. The Debtor Plaintiffs and New Chrysler seek a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), which, with exceptions not relevant here, provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

### PROCEDURAL HISTORY

On February 7, 2010, the two Illinois defendants filed a motion in this Court to withdraw the reference pursuant to either the mandatory or discretionary withdrawal provisions of 28 U.S.C. § 157(d). (Docket # 1.) They argued that the Complaint raised only issues of non-core federal law—specifically including federal preemp-

---

**2.** North Carolina's Transportation Secretary and its Commissioner of Motor Vehicles also were named as defendants, but the claims

against them have since been settled. (Docket # 9.)

tion, the Contracts Clause and the Federal Dealer Arbitration Statute, codified in the Consolidated Appropriations Act of 2010, Pub.L. 111–117, § 747, 123 Stat. 3034, 3219–21 (2009). The Maine and Oregon defendants did not join the motion to withdraw the reference. In a Memorandum and Order dated March 26, 2010, I concluded that the mandatory withdrawal provisions of section 157(d) applied, since the Complaint was based upon substantial and material issues of federal law outside of the Bankruptcy Code. (Docket # 9.)

The present motions followed. The Maine Automobile Dealers Association has submitted *amicus curiae* papers in opposition to the plaintiffs' motion. (Docket # 18.) In addition, the two Illinois defendants—Secretary of State Jesse White and Motor Vehicle Board Chairperson Terrence O'Brien—move to dismiss the Complaint.

## THE DECLARATORY JUDGMENT ACT AND SUBJECT MATTER JURISDICTION

■ This is an action for declaratory and injunctive relief against public officials in three states. Only the Oregon defendants contend that this Court lacks subject matter jurisdiction.[3] As discussed in greater detail below, for reasons unique to the Oregon defendants, the plaintiffs' motion for summary judgment against the Oregon defendants is denied. Nevertheless, due to the nature of the relief sought, I review the Declaratory Judgment Act and the basis for federal jurisdiction.

In *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court held that the Eleventh Amendment does not bar a suit for prospective injunctive relief against a state official alleged to have violated federal law. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Count I of the Complaint seeks declaratory relief as to federal preemption of the state laws, and Count II seeks declaratory relief as to a Contract Clause claim. (Compl. ¶¶ 65–79.) The Complaint also seeks a permanent injunction against "enforcement or application of the Rejected Dealer Amendments to New Chrysler...." (Complaint, Relief Requested ¶ (c).)

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "[T]he phrase 'case or actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007). In *MedImmune*, which arose in the patent context, the Supreme Court stated, among other things, that in a declaratory judgment action, "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat for example, the constitutionality of a law threatened to be enforced." *Id.* at 129, 127 S.Ct. 764 (emphasis in original). In declaratory judgment actions, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of suffi-

---

**3.** The Illinois defendants have stated that "Illinois submits that the Court has jurisdiction over this proceeding," with the exception of claims under the Illinois Constitution and claims for attorneys fees, which the plaintiffs have not pursued in their motion. (Ill. Mem. at 9.)

cient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.*

While the Second Circuit does not appear to have had occasion to address *MedImmune*, the ruling has been applied several times in this District. *See, e.g., Ass'n for Molecular Pathology v. U.S. Patent & Trademark Office,* 669 F.Supp.2d 365, 390–92 (S.D.N.Y.2009) (pursuant to *MedImmune,* plaintiffs had standing to bring a declaratory judgment action to challenge patents' validity and unconstitutionality, when alternative would require deliberate patent violations in order to test patents' lawfulness); *Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.,* 523 F.Supp.2d 376 (S.D.N.Y.2007) (denying motion to dismiss claim brought under the Declaratory Judgment Act when plaintiffs plausibly claimed high risk of harm due to defendants' likely future statements about authenticity of plaintiffs' product). In *AARP v. 200 Kelsey Associates, LLC,* 2009 WL 47499, at *8–9 (S.D.N.Y. Jan 8, 2009), then-District Judge Lynch held that an actionable case or controversy arose under the Declaratory Judgment Act when defendants allegedly "have taken significant steps" toward unlawful activity. In that case, the defendants had undertaken all but one step necessary to unlawfully infringe the plaintiff's trademarks. *Id.* at *9–10.

According to the Complaint and the record on summary judgment, the defendants are officers of states that have adopted laws alleged to be contrary to the Supremacy Clause and the Contract Clause. For the plaintiffs, the alternative to pursuing declaratory relief would be to test the constitutionality of the state dealer laws by violating them. As *MedImmune* notes, this is the very conduct that the Declaratory Judgment Act seeks to avoid. 549 U.S. at 128–29, 127 S.Ct. 764. Pursuant to *MedImmune,* the circumstances reflect a substantial controversy between parties with adverse legal interests, of immediacy and reality sufficient to entertain a declaratory judgment action. *See id.*

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vt. Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004). In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. U.S. Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d

Cir.1995) (internal quotations and citations omitted); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538. 587–8809861. In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. Rule 56(c). In the absence of any disputed material fact, summary judgment is appropriate. Rule 56(a).

Mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996) (citing *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348); *see also Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (summary judgment may be granted if the evidence is "merely colorable" or "not significantly probative") (citations omitted). An opposing party's facts "must be material and of a substantial nature, not fanciful frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 n. 14 (2d Cir.1981) (quotation marks omitted).

## DISCUSSION

### I. OVERVIEW OF THE DISPUTED STATE DEALER LAWS.

The disputed dealer amendments passed by Illinois, Maine and Oregon are directed toward the ability of a manufacturer or distributor to contract with a dealership franchise in a geographic market area recently occupied by a terminated dealer of the same vehicle brand. Each of the statutes became effective after the Sale Opinion of May 31, 2009 and the Rejection Order of June 9, 2009. An analysis of the plaintiffs' preemption and Contract Clause claims begins with the text of these statutory amendments. I review each in turn.

### A. *Illinois.*

The Illinois Motor Vehicle Franchise Act, 815 Ill. Comp. Stat. 710/4, prohibits a variety of unfair practices between automobile manufacturers and franchisees. The disputed amendments to that law are set forth in Illinois House Bill 4628, which became effective on November 25, 2009, and are specifically directed to a franchisee's relationship with a "successor manufacturer" of motor vehicles. *See* 815 Ill. Comp. Stat. 710/4(h); 2009 Ill. Legis. Serv. P.A. 97–824 (H.B.4628). A "successor manufacturer" is defined as "any motor vehicle manufacturer that, on or after January 1, 2009, acquires, succeeds to, or assumes any part of the business of another manufacturer...." 815 Ill. Comp. Stat. 710/4(h). There is no dispute that this definition applies to New Chrysler.

The amendments make it "unlawful" for any "successor manufacturer to enter into a same line make franchise with any person or to permit the relocation of any existing same line make franchise ... within the relevant market area of a former franchisee ... without first offering the additional or relocated franchise to the former franchisee ... at no cost and without any requirements or restrictions other than those imposed generally on the manufacturer's other franchisees at that time...." 815 Ill. Comp. Stat. 710/4(h). The amendments grant a three-year right of first refusal to preexisting franchisees before a successor manufacturer may open or relocate a dealership in "the relevant market area." *Id.* If the successor manufacturer seeks to open a new franchise in a market area where two former franchisees operate, it may offer the franchise to either franchisee, but "may not offer it to any person other than one of those former franchisees...." *Id.*

The amendments also provide that a successor manufacturer may terminate a

franchise agreement with a former franchisee if the successor can establish "good cause" for the termination. 815 Ill. Comp. Stat. 710/4(h)(3). The state's Motor Vehicle Review Board administratively adjudicates a claim of good cause pursuant to a list of factors set forth at 815 Ill. Comp. Stat. 710/12(d). Factors weighed in a good cause determination include a franchise's retail sales and the permanence of a franchisee's investments. *Id.* 710/12(d)(1) & (3). Alternatively, the successor manufacturer can offer to pay fair market value for its former franchise. *Id.* 710/4(h)(2).

### B. *Maine.*

Maine statute prohibits certain conduct between vehicle manufacturers, distributors and dealers. Me.Rev.Stat. tit. 10, § 1174. Effective June 17, 2009, Maine's legislature amended its statutes to give vehicle dealership franchises in Maine rights of first refusal and blocking rights against new dealerships. *See* 2009 Me. Legis. Serv. Ch. 432 (West). Similar to the Illinois amendments, Maine defines a "successor manufacturer" to mean "any manufacturer that succeeds, or assumes any part of the business of, another manufacturer" as a result of "[a] change in ownership, operation or control of the predecessor manufacturer...." Me.Rev.Stat. tit. 10, § 1171(16).

The Maine amendments prohibit a successor manufacturer from "offer[ing] a franchise to any person for a line make of a predecessor manufacturer in any franchise market area in which the predecessor manufacturer previously cancelled, terminated, noncontinued, failed to renew or otherwise ended a franchise agreement with a franchisee who had a franchise facility in that franchise market area without first offering the franchise to the former franchisee at no cost...." Me.Rev.Stat. tit. 10, § 1174(3–A). The statute provides exceptions to this right of first refusal in the event that the successor manufacturer uses a previously existing franchise in the market area, the successor manufacturer pays the former franchisee fair market value for the dealership, or the successor manufacturer "proves that the former franchisee is not competent to be a franchisee." Me.Rev.Stat. tit. 10, § 1174(3–A)(A–C).

### C. *Oregon.*

Effective June 26, 2009, the Oregon state legislature amended the state's motor vehicles laws as to a franchisee's relationship with a "successor in interest" to a manufacturer, distributor or importer. *See* 2009 Or. Laws Ch. 627 (H.B.2739). Oregon statute defines a "successor in interest" to mean "a manufacturer, distributor or importer that acquires ... the right to manufacture, distribute or import motor vehicles using the trademark, service mark, trade name, logotype or other commercial symbol of another manufacturer, distributor or importer." Or.Rev.Stat. § 650.120(17).

The Oregon amendments grant "[a] dealer or former dealer" a private right of action to enjoin "a manufacturer, distributor or importer, or the manufacturer, distributor's or importer's successor in interest" from various actions, provided that a "dealer or former dealer" can establish "good cause" for the injunction. Or.Rev.Stat. § 650.150(1–3). Manufacturer conduct that may be enjoined specifically includes "franchising an additional motor vehicle dealership of the same line-make within the dealer's or former dealer's relevant market area," *id.* § 650.150(1), "relocating" an existing dealer to a "dealer's or former dealer's relevant market area," with certain exceptions, *id.* § 650.150(2), and "franchising a replacement dealer to operate a dealership of the same-line make within the dealer's or former dealer's relevant market area," *id.* § 650.150(3)(a).

Oregon defines "relevant market area" as a ten- to twenty-mile radius from a dealership site, and calculates the distance based on local population. *Id.* § 650.120(15). Similar provisions previously existed under Oregon law, but the amendments changed the law to grant a *former* dealer the right to pursue injunctive relief, and expanded the statute's restrictions to cover a "successor in interest." *See* 2009 Or. Laws Ch. 627 (H.B.2739); Or.Rev.Stat. § 650.150(1–3). The statute does not appear to define the phrase "former dealer."

The Oregon statute also was amended to expand the definition of the "good cause" needed for a dealer or former dealer to obtain injunctive relief. *See id.* § 650.150(4). Prior to the amendments, a dealer needed to show "threats or other coercive action" from the manufacturer or distributor, an ultimatum in which "the dealer is asked to terminate one franchise in order to keep another franchise," "an unjustifiable adverse effect" on existing dealers because of a new or relocated franchise, and consumer impact. *See id.;* Or. Rev.Stat. § 650.150(4)(a-b) & (f-g). The amendments expanded the showing of good cause, and therefore the availability to injunctive relief, to include a list of factors set forth at Oregon Revised Statute section 150.130; a separate consideration of whether the manufacturer, distributor or successor in interest "breached the terms or provisions of a franchise;" and whether the manufacturer, distributor or successor in interest engaged in categories of prohibited conduct set forth at Oregon Revised Statute section 150.140. *See* 2009 Or. Laws Ch. 627 (H.B.2739); Or.Rev.Stat. § 650.150(4)(c-e).

## II. THE BANKRUPTCY CODE AND THE ORDERS OF THE BANKRUPTCY COURT PREEMPT THE STATE DEALER LAWS.

■ The Constitution's Supremacy Clause, Article VI, Clause 2, states that federal law "shall be the supreme Law of the Land ... any Thing in the Constitutions or Laws of any State to the contrary notwithstanding." Since *Gibbons v. Ogden,* 9 Wheat. 1, 6 L.Ed. 23 (1824), it has been "[a] fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Courts recognize three categories of federal preemption:

> (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, 'where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law'; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.

*New York SMSA Ltd. Partnership v. Town of Clarkstown,* 612 F.3d 97, 104 (2d Cir.2010) (per curiam) (quoting *Wachovia Bank, N.A. v. Burke,* 414 F.3d 305, 313 (2d Cir.2005)). In application, these categories may be overlapping or complementary. *See, e.g., Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.,* 537 U.S. 51, 65, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002) (a statute's express preemption provision may support a holding of implied conflict preemption).

■ "By their nature, field preemption and conflict preemption are usually found based on implied manifestations of congressional intent." *New York SMSA Ltd.,* 612 F.3d at 104. "[E]ven if Congress has not occupied the field, state law is nevertheless pre-empted to the extent it actually conflicts with federal law, that is, when compliance with both state and federal law

is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *California v. ARC America Corp.*, 490 U.S. 93, 100–01, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989). The Supreme Court has held that federal bankruptcy law expressly supersedes state laws directed toward insolvency. *International Shoe Co. v. Pinkus*, 278 U.S. 261, 265, 49 S.Ct. 108, 73 L.Ed. 318 (1929) ("In respect of bankruptcies the intention of Congress is plain. The national purpose to establish uniformity necessarily excludes state regulation.").

▮ Preemption is presumed not to apply in areas traditionally regulated by the States. *See, e.g., Wyeth v. Levine*, 555 U.S. 555, 129 S.Ct. 1187, 1194–95, 173 L.Ed.2d 51 (2009) (the states' "historic police powers" are presumed not to be superseded by federal law, absent an express statement of Congress); *Hillsborough County, Fla. v. Automated Medical Labs., Inc.*, 471 U.S. 707, 715–16, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) ("regulation of matters related to health and safety" are presumed not to be preempted). The presumption is overcome, however, when state law cannot be reconciled with federal law. *See, e.g., Boggs v. Boggs*, 520 U.S. 833, 840–41, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) (conflict preemption requires state community property law to give way to ERISA, even though community property laws "implement policies and values lying within the traditional domain of the States.").

The exclusive authority of Congress and the federal courts to pass and enforce the bankruptcy laws has long been recognized, and the federal courts have guarded against the states' encroachment into bankruptcy. *Int'l Shoe*, 278 U.S. at 263–64, 49 S.Ct. 108 ("A state is without power to make or enforce any law governing bankruptcies that impairs the obligation of contracts or ... conflicts with the national bankruptcy laws."); *In re Prudence Co.*, 79 F.2d 77, 80 (2d Cir.1935) ("[A] declaration by a state that a certain class of corporations is not amenable to bankruptcy is *brutum fulmen*, unless the Bankruptcy Act itself excepts that class."); *In re Bankshares Corp. of U.S.*, 50 F.2d 94, 95 (2d Cir.1931) ("No state enactment may limit the jurisdiction of the bankruptcy court.").

Courts including the Second Circuit have discussed in detail the Bankruptcy Code's preemption of state-law claims in the context of tort claims asserting injury from a defendant's conduct in bankruptcy proceedings. In each case, a plaintiff commenced an action asserting that a defendant's action in bankruptcy court were contrary to state law, and raised the claim in a tribunal other than bankruptcy court. Courts have uniformly concluded that the Bankruptcy Code preempted the state law claims.

In *Eastern Equipment & Services Corp. v. Factory Point Nat'l Bank*, 236 F.3d 117, 121 (2d Cir.2001) (per curiam), the plaintiffs commenced an action in federal district court, and asserted several state-law tort claims directed toward the defendants' alleged failure to abide by the Bankruptcy Code's automatic-stay provision, 11 U.S.C. § 362. *Id.* at 121. The district court held that federal law preempted the plaintiffs' state-law claims, and that, moreover, claims directed toward violation of the automatic stay should have been brought in the underlying bankruptcy proceedings, not in a separate district court action. *Id.* at 120. The Second Circuit affirmed, stating that as to preemption, "[t]he United States Bankruptcy Code provides a comprehensive federal system of penalties and protections to govern the orderly conduct of debtors' affairs and creditors' rights."

*Id.* It held that the following factors weighed in favor of the Bankruptcy Code's preemption of state tort laws:

> (1) Congress placed bankruptcy jurisdiction exclusively in the district courts under 28 U.S.C. § 1334(a); (2) Congress created a lengthy, complex and detailed Bankruptcy Code to achieve uniformity; (3) the Constitution grants Congress exclusive power over the bankruptcy law, see U.S. Const. art. I, § 8 cl. 4; (4) the Bankruptcy Code establishes several remedies designed to preclude the misuse of the bankruptcy process; and (5) the mere threat of state tort actions could prevent individuals from exercising their rights in bankruptcy, thereby disrupting the bankruptcy process.

*Id.* at 121 (citing *MSR Exploration, Ltd. v. Meridian Oil, Inc.,* 74 F.3d 910, 913–16 (9th Cir.1996)).

While the facts of *Eastern Equipment* were limited to claims alleging noncompliance with the automatic stay, in *Astor Holdings, Inc. v. Roski,* 325 F.Supp.2d 251, 262 (S.D.N.Y.2003), then-District Judge Lynch observed that *Eastern Equipment* articulated "the broad scope of bankruptcy preemption," and that "the factors considered by the Second Circuit in reaching this conclusion relate to all aspects of the bankruptcy process, not just the automatic stay provision...." In *Astor Holdings,* the plaintiff asserted a breach of fiduciary duty claim based in part on an allegation that the defendant induced a third party to file for bankruptcy, thereby harming the plaintiff. *Id.* Judge Lynch held that the claim was preempted, "since preemption entails that a claim that could have been made, and for which a remedy is provided, under the Bankruptcy Code cannot be the subject of regulation by state statutory or common-law remedies." *Id.* Moreover, " 'no *authorized proceeding* in bankruptcy can be questioned in a state court or used as the basis for the assertion of a tort claim in state court against any defendant.' " *Id.* (emphasis in original) (quoting *Choy v. Redland Ins. Co.,* 103 Cal.App.4th 789, 127 Cal.Rptr.2d 94 (Cal.Ct.App.2002)). Because the Bankruptcy Code includes " 'several remedies designed to preclude the misuse of the bankruptcy process,' " the plaintiff's claim was preempted. *Id.* (quoting *Eastern Equipment,* 236 F.3d at 121).

*Eastern Equipment* and *Astor Holdings* both relied on the Ninth Circuit's *MSR Exploration* opinion, which Judge Lynch described as using "sweeping language" comparable to *Eastern Equipment. Id.* at 263. In *MSR Exploration,* plaintiffs brought malicious prosecution claims directed toward the contents of the defendants' bankruptcy filings. 74 F.3d at 912. According to the Ninth Circuit:

> [A] mere browse through the complex, detailed, and comprehensive provisions of the lengthy Bankruptcy Code demonstrates Congress's intent to create a whole system under federal control which is designed to bring together and adjust all the rights and duties of creditors and embarrassed debtors alike. While it is true that bankruptcy law makes reference to state law at many points, the adjustment of rights and duties within the bankruptcy process itself is uniquely and exclusively federal. It is very unlikely that Congress intended to permit the superimposition of state remedies on the many activities that might be undertaken in the management of the bankruptcy process.... In short, the highly complex laws needed to constitute the bankruptcy courts and regulate the rights of debtors and creditors also underscore the need to jealously guard the bankruptcy process from even slight incursions and disruptions

brought about by state malicious prosecution actions.

*Id.* at 914 (internal citation omitted). *MSR Exploration* proceeded to observe that even a minor incursion into federal bankruptcy was tantamount to "state courts, in effect, interfering with the whole complex, reticulated bankruptcy process itself." *Id.; accord In re Miles,* 430 F.3d 1083, 1090 (9th Cir.2005) ("Allowing state court remedies for wrongful filings may well interfere with the filings of involuntary bankruptcy petitions by creditors and with other necessary actions that they, and others, must or might take within the confines of the bankruptcy process."). Citing to the Federalist Papers and the commentaries of Justice Story, *MSR Exploration* described federal primacy in the bankruptcy realm as "unique, historical, and even constitutional. . . ." 74 F.3d at 915.

*Eastern Equipment, Astor Holdings* and *MSR Exploration* all arose out of collateral litigations that challenged the conduct of bankruptcy proceedings. The state dealer laws, in their current form, pose similar obstacles to the enforcement of the Bankruptcy Code and the lawful judicial orders issued thereunder. Claims brought under the states' dealer amendments would necessarily revisit the Rejection Opinion and the Rejection Order, amounting to a use of state law to mount a collateral attack on the Bankruptcy Court's Rejection Order. The Bankruptcy Code explicitly grants a bankruptcy court the power to reject an executory contract. 11 U.S.C. § 365(a) ("the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."). As noted in the Rejection Opinion, the authority to reject an executory contract has been described by the Supreme Court as "'vital to the basic purpose to a Chapter 11 reorganization. . . .'" 406 B.R. at 187 (quoting *NLRB v. Bildisco*

*& Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)).

The Rejection Opinion based its reasoning on the business judgment standard, which applies when a Bankruptcy Court approves a debtor's assumption or rejection of a contract. *Id.* at 187–88 (summarizing business judgment standard and rejecting argument that state dealer statutes alter the standard's application). Acting pursuant to 11 U.S.C. §§ 105 and 365, the Bankruptcy Court concluded that rejection of certain dealer contracts was necessary "to rationalize [the debtors'] dealership network." *Id.* at 193. The Rejection Opinion, in a lengthy and detailed analysis, held that it was a valid business judgment that a smaller, more centralized, more concentrated network of dealerships would be in the debtors' best business interests, and that the debtors had performed "comprehensive statistical assessments" of each existing dealer to reach an "optimal configuration" for a national market. *Id.* at 193–99. The Bankruptcy Court specifically noted that "there is no doubt that the acceleration of dealership rationalization benefited New Chrysler by enabling it to avoid the costs attendant to such reduction if it took place outside bankruptcy." *Id.* at 197.

■ The defendants argue that the Supremacy Clause and preemption doctrine do not apply to federal judicial rulings, and instead apply only to regulations and statutes. But the Bankruptcy Code is not self-executing. In approving the assumption and rejection of certain dealer agreements, the Bankruptcy Court implemented 11 U.S.C. § 365(a). The Bankruptcy Code vests the bankruptcy courts with authority to implement the federal statutory scheme, and grants them the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see*

also *Adelphia Business Solutions, Inc. v. Abnos*, 482 F.3d 602, 609 (2d Cir.2007) (Congress granted "broad equitable power to the bankruptcy courts to carry out the provisions of the Bankruptcy Code so long as that power is exercised within the confines of the Bankruptcy Code.").

The principles of conflict preemption preclude application of the challenged state dealer amendments to deny the debtor and the purchaser the benefits of a judicially approved rejection of certain dealer franchise agreements in accordance with the Bankruptcy Code. Based on the record before me, the plaintiffs have established that compliance with the state dealer amendments would frustrate and undermine lawful actions taken pursuant to the Bankruptcy Code. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) ("We have found implied conflict pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.") (internal citation and quotation marks omitted). Compliance with the state amendments would deprive New Chrysler of the Rejection Order's terms. The Rejection Order, which implemented the rather ordinary action of rejection an executory contract, allowed the debtors to maximize value to the creditors, consistent with the goals of bankruptcy law.

The Bankruptcy Court has previously discussed the preemptive effect of its rulings. In holding that claims brought by Rejected Dealers in Arkansas and Ohio were preempted by the Rejection Order and the Rejection Opinion, the Bankruptcy Court held as follows:

> The Subject Actions are in direct conflict with the terms of the Rejection Order because the Dealers are seeking to burden New Chrysler with the obligation of either continuing the previously rejected dealer agreements or suffering other unfavorable consequences as a result of the rejected dealer agreements. The Rejection Order ended the Dealers' rights to act as authorized dealers while Wisconsin, Ohio, and Arkansas statutes resurrect precisely those rights to compel New Chrysler, the successor/transferee of Debtors, to resume the dealer agreements. As there is a direct conflict between the Rejection Order and the statutes under which the Subject Actions are based, the state statutes are preempted under the Rejection Order and the Dealers are enjoined under the Sale Order from bringing any actions pursuant to these statutes in any court.
>
> . . .
>
> Both the Rejection Order and the Rejection Opinion found that, in their business judgment, the Debtors' rejection of the agreements was necessary and appropriate to consummate the Fiat Transaction and transfer to the purchaser, New Chrysler, a smaller, more effective, and more profitable dealer network without disruption while limiting the Debtors' potential postpetition obligations to the rejected dealers. Since the actions undertaken ... pursuant to the so-called "blocking statutes" would frustrate the benefit achieved through the rejection process, such statutes were preempted and the Subject Actions precluded.

(Compl. Ex. F at 8–9.) The Rejection Order included the following statement:

> To the extent that any Dealer Laws conflict with the terms of this Order or the impact of the rejection of the Rejected Agreements under the Bankruptcy Code and applicable case law, such laws are preempted by the Bankruptcy Code, pursuant to the Supremacy Clause of the United States Constitution.

(Rejection Order ¶ J.) The Bankruptcy Court's reasoning applies with equal force to the plaintiffs' challenge to the amendments.

In at least two other instances, federal courts have held that the Bankruptcy Code preempts the application of state laws governing the relationship between automobile franchises and manufacturers. *In re Dan Hixson Chevrolet Co.*, 12 B.R. 917, 920 (Bankr.N.D.Tex.1981), held that 11 U.S.C. § 365 preempted the Texas Motor Vehicle Code, even though the state statute reflected a proper exercise of the state's police power. Texas statute made it unlawful for a manufacturer to terminate a franchise against a dealer's objections, absent proving good cause before an administrative tribunal. *Id.* at 922–23. The court held that section 365 of the Bankruptcy Code and the Texas dealership laws "both regulate[d] the executory contractual relationship between a manufacturer and a dealer-debtor." Id at 924. Enforcement of the state statute "would frustrate the purposes of federal bankruptcy laws," the court held, "as Congress by enacting § 365 of the Bankruptcy Code has withdrawn from all other courts the power to decide this issue." *Id.* The second opinion, *In re Tom Stimus Chrysler–Plymouth, Inc.*, 134 B.R. 676, 678–79 (Bankr. M.D.Fla.1991), concluded in more summary fashion that "the assumption or rejection of the [dealer] contract with Chrysler is governed by § 365 of the Code, rather than the Florida Statutes relied on by Chrysler."

The parties do not dispute that Illinois's definition of a "successor manufacturer" applies to New Chrysler, or that the state bars New Chrysler from "enter[ing] into a same line make franchise" or "relocat[ing]" a franchise for a three-year period, without first granting a right of first refusal "to the former franchisee ... at no cost and without any requirements or restric-

tions...." 815 Ill. Comp. Stat. 710/4(h). Under the statute, these requirements can be avoided only if the "successor manufacturer" can make a showing of "good cause" before a state administrative tribunal. 815 Ill. Comp. Stat. 710/4(h)(3) & 710/12(d). The Illinois statutory scheme is contrary to the Rejection Order and the Rejection Opinion, which have already approved New Chrysler's termination of Rejected Dealer Agreements. It renders impossible full enforcement of the orders of the Bankruptcy Court, and is the type of "superimposition of state remedies on the many activities that might be undertaken in the management of the bankruptcy process" held to be unlawful by *MSR Exploration*, 74 F.3d at 914.

The Maine statute is preempted for the same reason. Maine's definition of "successor manufacturer" applies to New Chrysler, and, similar to the Illinois statute, prohibits a successor manufacturer from "offer[ing] a franchise to any person for a line make of a predecessor manufacturer" in a market area where a previous franchise agreement was "otherwise ended." Me.Rev.Stat. tit. 10 §§ 1171(16) & 1174(3–A). The statute provides limited exemptions only if the successor manufacturer contracts with a previously existing franchise in the same market area, or when it "proves" that the former franchisee "is not competent to be a franchisee." Me.Rev.Stat. tit. 10 § 1174(3–A)(A–C). As with the Illinois amendments, Maine law acts as an obstacle to enforcement of the Rejection Order and the Rejection Opinion, and superimposes a conflicting state statutory regime on the Bankruptcy Court's orders.

The Maine defendants argue that the effects of their state's law on New Chrysler's "return to profitability" would be negligible, whereas revoking the dealer contracts would be harmful to the state's economy. (Maine Mem. at 5.)

They assert that rejection of the Maine franchises may materially impair the state's tax revenues, and offer the declaration of Jerome D. Stanhope, a financial analyst at the Maine Revenue Services Economic Research Division who states that in the preceding five years, the state earned between $111,000,000 and $133,000,000 annually in sales and use taxes on its automobile dealers. (Maine Mem. at 5; Stanhope Dec. ¶ 3 & Ex. 1.) A second declarant states that dealers of new cars are responsible for approximately 1% of total private employment in the state of Maine. (Mills Dec. ¶ 5.) While the Maine automobile dealer franchise laws appear to be a lawful exercise of the state's police powers, see N.A. Burkitt, Inc. v. J.I. Case Co., 597 F.Supp. 1086, 1092 (D.Me.1984), their application to New Chrysler raises a direct conflict with the application of 11 U.S.C. § 365. The presumption that an exercise of police powers will not be preempted by federal law is overcome. See, e.g., Boggs, 520 U.S. at 840–41, 117 S.Ct. 1754 (ERISA preempts state community property laws despite their traditional state function). The Supremacy Clause of the U.S. Constitution resolves the direct conflict in favor of the federal statute.[4]

Separately, Maine and Illinois each contends that summary judgment should be denied because the state's state dealer amendments are consistent with a recently passed federal arbitration statute. The Federal Dealer Arbitration Statute (the "FDAS"), codified in the Consolidated Appropriations Act of 2010, Pub.L. 111–117, § 747(a), 123 Stat. 3034, 3219–21 (2009), provides for arbitration between "an automobile manufacturer in which the United States Government has an ownership interest, or to which the Government has provided financial assistance...." and "an automobile dealership that had a franchise agreement for the sale and service of vehicles of a brand or brands with a covered manufacturer in effect as of October 3, 2008...." Under the FDAS, a dealership "that was not lawfully terminated under applicable State law on or before April 29, 2009 shall have the right to seek, through binding arbitration, continuation, or reinstatement of a franchise agreement," or to be added as a franchisee to the manufacturer's dealer network in the same geographic area. Id. § 747(b). If a manufacturer terminates its relationship with a dealer, the manufacturer must provide a written explanation as to why. Id. § 747(c). A rejected dealer may commence binding arbitration with a manufacturer, with the arbitration "balanc[ing]" the parties' economic interests and the interests of the public at large. Id. § 747(d). The FDAS also states: "Notwithstanding the requirements of this provision, nothing herein shall prevent a covered manufacturer from lawfully terminating a covered dealership in accordance with applicable State law." Id. § 747(g).

The Maine defendants and the Illinois defendants argue that the state dealer

---

**4.** The arguments set forth in the amicus brief filed by the Maine Automobile Dealers Association are similarly unavailing. The amicus brief contends that Maine law is not in conflict with the Bankruptcy Court's application of section 365, because Maine does not block the rejection of dealer agreements. (Amicus Br. at 5–6.) Rather, according to the amicus brief, Maine law "simply requires that [New Chrysler] first offer the franchise to the former dealer" in the event that it "decides to ... refranchise the former dealer's territory." (Amicus Br. at 6.) Even under this interpretation of the Maine Law, New Chrysler's rejection of a dealer agreement requires New Chrysler either to halt lawful sales activities in a certain territory or adhere to the existing dealer agreements contrary to the Bankruptcy Court's order. The Maine law and the Bankruptcy Code are therefore in conflict, and the Maine law is preempted.

amendments embody the policies of the FDAS, and that the state laws are therefore not preempted by the Bankruptcy Code. The state defendants do not adequately articulate how the preemption analysis should be informed by the relationship between the Bankruptcy Code, the FDAS and the state dealer statutes. For instance, the Maine defendants argue that the FDAS "suggests" that "there may be an opportunity for affected dealers to obtain some relief from the adverse consequences of a rejected agreement," and that, as a result, the Bankruptcy Code does not occupy the entire field of state dealer statutes. (Maine Mem. at 3.) This purported suggestion of the FDAS does not bear on the preemption analysis.

Moreover, the FDAS applies only to dealerships that were "not lawfully terminated under applicable State law on or before April 29, 2009," Pub.L. 111–117, § 747(b), 123 Stat. at 3220, but the amendments of Illinois, Maine and Oregon were passed in June and November of 2009. To the extent that the FDAS incorporates compliance with state law, it applies only to agreements terminated prior to the passage of the challenged state statutes.[5]

Even assuming that the FDAS could be relevant to the Bankruptcy Code's preemption, its provisions going toward binding arbitration vary from the terms of the state dealer amendments. The FDAS recites a number of factors that an arbitrator is required to consider, including the manufacturer's "overall business plan" and whether the franchise has met performance goals. Pub.L. 111–117, § 747(d), 123 Stat. at 3220–21. By contrast, the statutes

of Maine and Illinois grant all dealers a right of first refusal, and otherwise require a manufacturer to prove "good cause" before an administrative tribunal. 815 Ill. Comp. Stat. 710/4(h) & 710/12(d); Me.Rev. Stat. tit 10, § 1174(3–A). The state laws are contrary to the Bankruptcy Court's order by presuming enforcement of a status quo rejected by the Bankruptcy Court. The FDAS and the state statutes do not, then, employ similar approaches to review the termination of a franchise. In any event, even if they were identical, the defendants have set forth no basis in fact or law supporting their contention that the FDAS establishes safe harbor for state statutes contrary to the Bankruptcy Code.

For the foregoing reasons, I conclude that the federal Bankruptcy Code, as enforced by the orders of the Bankruptcy Court, preempts the disputed statutory amendments of Maine and Illinois as they apply to the plaintiffs. Summary judgment is therefore granted to the plaintiffs.

### III. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IS DENIED AS TO THE OREGON DEFENDANTS.

■ The Oregon defendants argue that the Court lacks subject matter jurisdiction over the claims against them, and assert that the Complaint should therefore be dismissed pursuant to Rule 12(h)(3), Fed. R.Civ.P. Rule 12(h)(3) provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." According to the Oregon defendants, the plaintiffs lack standing to pursue declaratory relief against the Oregon defendants, and, in any

---

**5.** No party relies on section 747(g) of the FDAS, which, as noted, provides that a manufacturer may lawfully terminate a dealership contract pursuant to state law, notwithstanding the terms of the FDAS. This may be because section 747(g) treats as binding a state's determination that a contract has been termi-

nated, but does not similarly recognize an order directing that the contract remain in effect. In other words, the FDAS recognizes a state's termination of a franchise agreement, but not a state requirement that an agreement remain in effect.

event, the plaintiffs' claims against them are not ripe.

The Oregon defendants' arguments going toward the justiciability of this case assert that any injury is not yet realized, and therefore does not constitute an actual case or controversy. As previous discussed, *MedImmune* held that the Declaratory Judgment Act permits a plaintiff to seek prospective declaratory relief rather than face exposure to liability or injury before seeking remedial relief. 549 U.S. at 128–29, 127 S.Ct. 764. I need not revisit the issue, however, as the plaintiffs' summary judgment motion must be denied for another reason: under Oregon statute, the plaintiffs apparently have sued the wrong parties.

Oregon's statute governing the "[p]owers and duties" of the state attorney general states: "The Attorney General shall: (d) Appear, commence, prosecute or defend any action, suit, matter, cause or proceeding *in any court when requested by any state officer, board or commission when, in the discretion of the Attorney General, the same may be necessary or advisable to protect the interests of the state."* Or.Rev.Stat. § 180.060(1)(d) (emphasis added). The plaintiffs have relied on this statute in their submissions to the Court, but have misleadingly and inaccurately distorted its meaning by omitting the emphasized language. The text of the statute grants the attorney general broad discretion to "[a]ppear ... or defend any action ... in any court," but only "when requested by any state, officer, board or commission...." *Id.* This limited authority is consistent with other provisions of the statute, which repeatedly sets limitations on when the attorney general may appear in a case. The other subsections of 180.060(1) provide for the attorney general to appear for the state before the Supreme Court or the Court of Appeals and to appear for the state when so required by the governor or legislature. The attorney general performs "all legal services" for the state or one of its departments or offices only "when requested...." *Id.* § 180.060(6). At section 180.060(9), the statute states that "[t]he Attorney General may not appear in an action, suit, matter, cause or proceeding in a court ... on behalf of an officer, agency, department, board or commission without the consent of the officer, agency, department, board or commission."

The Ninth Circuit has recognized that Oregon's attorney general has limited power to defend the state's laws. In *Southern Pacific Transportation Company v. Brown*, 651 F.2d 613 (9th Cir.1980), the Ninth Circuit held that the plaintiff railroad companies incorrectly named the Oregon attorney general a defendant in an action that sought to enjoin Oregon's statutory penalties directed to workplace accidents. The statute granted district attorneys discretion to prosecute actions. *Id.* at 614. The attorney general was not responsible for the statute's enforcement, and he lacked power to compel or restrain the state's district attorneys. *Id.* The court described as "wholly speculative" the plaintiffs' assertion that the attorney general could bring an action to enjoin violations of the statute. *Id.* at 614 n. 2. Oregon's statute limited the attorney general's relationship with district attorneys to an advisory capacity. *Id.* at 614 (citing Or. Rev.Stat. § 180.060(4)). Under *Ex Parte Young*, 209 U.S. at 157, 28 S.Ct. 441, and its progeny, a state officer was properly named in a suit to enjoin enforcement of state law only if there was "some connection" between the officer and the law's enforcement. 651 F.2d at 615. The Ninth Circuit held that "[t]he attorney general's power to direct and advise does not make the alleged injury fairly traceable to his action, nor does it establish sufficient connection with enforcement to satisfy *Ex parte Young."* *Id.*

The reasoning of *Southern Pacific* is instructive here. As in that case, the attorney general here is not delegated the authority to enforce the Oregon statute, which provides that a "dealer or former dealer" may initiate a private injunctive action. Or.Rev.Stat. § 650.150(1–3). Oregon statute grants the attorney general limited authority to represent the state's interests in court, with the power to do so only in certain tribunals (not including federal district court) or at the direction of other governmental units. *Id.* §§ 180.060(1)(a) & (d), 180.060(6), 180.060(9).

Similarly, Oregon's director of the state's Department of Transportation is not delegated authority to enforce the statute or adjudicate claims of good cause. The Oregon statute provides for a private right of action by a dealer or former dealer, which is enforced in the courts. It does not provide for administrative adjudication of the termination of a franchise or delegate enforcement authority to the Department of Transportation. Nothing in the record or in the law indicates that the director of the Oregon Department of the Transportation has power to enforce the state's dealer amendments.

The plaintiffs' motion for summary judgment is denied as to the Oregon defendants.

## IV. THE MOTION TO DISMISS FILED BY THE ILLINOIS DEFENDANTS IS DENIED.

The motion to dismiss filed by the Illinois defendants does not set forth any arguments distinguishable from those raised in their opposition to summary judgment. For the reasons already explained, the motion to dismiss filed by the Illinois defendants is denied.

CONCLUSION

The plaintiffs' motion for summary judgment is GRANTED as to their preemption claim against the Illinois and Maine defendants. (Docket # 11.) It is denied as to the Oregon defendants. The motion to dismiss filed by the Illinois defendants is DENIED. (Docket # 32.)

The parties are directed confer as to a proposed form of judgment that sets forth both the declaratory and injunctive relief sought in the Complaint. The proposed form of judgment should be submitted to the Court no later than December 20, 2010. In the event that the parties are unable to agree on a proposed form of judgment, the plaintiffs shall submit a proposed judgment and the defendants may set forth the basis for their disagreements via letter—brief within three days.

SO ORDERED.